Public Utilities Commission
No. 91-042

APPEAL OF ATLANTIC CONNECTIONS, LTD.

(New Hampshire Public Utilities Commission)

May 5, 1992

*Shaines & McEachern P.A.*, of Portsmouth (*Susannah Colt* and *Paul McEachern* on the brief, and *Mr. McEachern* orally), for Atlantic Connections, Ltd.

*Devine, Millimet & Branch P.A.*, of Manchester (*Frederick J. Coolbroth* on the brief and orally), for Granite State Telephone, Inc. and Merrimack County Telephone Company.

*John P. Arnold*, attorney general, and *Eugene F. Sullivan, III*, of Concord (*Harold T. Judd*, assistant attorney general, and *Mr. Sullivan* on the brief, and *Mr. Judd* orally), for the State, as *amicus curiae*.

JOHNSON, J.    Atlantic Connections, Ltd. (Atlantic) appeals from a public utilities commission (PUC) order that it cease and desist from intrastate telecommunications resale operations, pay a $5,000 fine, and apply to the PUC for a certificate of service. We affirm.

In 1988, Atlantic commenced business in Portsmouth as a reseller of long-distance telephone services without obtaining a franchise from the PUC pursuant to RSA 374:22 (1984 and Supp. 1991). According to the PUC report, resellers typically own telecommunication switches and lease interexchange facilities from either the local Bell Operating Company or a franchised long-distance carrier, such as AT&T, that owns its own interexchange facilities. Resellers then purchase a long-distance service from an underlying carrier and resell the use of the lines to their own customers. They profit by attaining discounts available to high volume telephone users and then passing on a portion of the savings to small businesses or residential customers who are not otherwise eligible for such discounts.

The record indicates that Atlantic conducted business in a manner typical of long-distance resellers. It owned a telecommunications switch in New England Telephone's (NET) Portsmouth local exchange area. It leased interexchange facilities from NET for intrastate calls, and from AT&T, Sprint and MCI for interstate calls. When a call entered Atlantic's switch via the Portsmouth local exchange network, Atlantic would identify the destination of the call and select the leased line that offered the least cost route.

On March 23, 1990, the PUC opened a docket to investigate whether Atlantic was a public utility operating without the commission's authority. RSA 362:2 (Supp. 1991) defines a "public utility" as

"every corporation, company, association, joint stock association, partnership and person, their lessees, trustees or receivers appointed by any court, except municipal corporations and county corporations operating within their corporate limits, owning, operating or managing any plant or equipment or any part of the same for the conveyance of telephone or telegraph messages . . . for the public."

After five days of hearings, the PUC found that Atlantic was a "public utility."

The PUC issued a report explaining this finding. In the report, the PUC addressed Atlantic's argument that it was not engaged in the "conveyance of telephone or telegraph messages," RSA 362:2 (Supp. 1991), because, like a telephone answering service, it did not own interexchange facilities. The PUC rejected this argument:

"Atlantic's attempt to compare itself to a telephone answering service cannot be accepted. When a telephone answering service intercepts a call for a customer, the call terminates after the answering service accepts the message. The customer then receives the message from the answering service. There is no direct communication between the customer and the calling party, but rather two separate telephone calls.

In contrast to a telephone answering service, Atlantic's switch does in fact convey the call between its customer and the called party. As described above, the Atlantic switch identifies the location of the called party and transports the call over the least cost route to its ultimate destination. As staff witness Kathryn Bailey testified, when an Atlantic customer uses Atlantic to complete a call, the Atlantic switch performs the actual physical connection that establishes the two-way communication path between the Atlantic customer and the called party. Contrary to Atlantic's assertion, there is only one telephone call and, in accordance with the statutory definition, Atlantic's network of its switch and leased lines conveys the telephone message for the benefit of its customers."

(Footnote omitted.) The PUC also dismissed Atlantic's argument that the PUC's regulatory authority was limited to natural monopolies. On appeal to this court, Atlantic maintains that the PUC erred in finding that it was a "public utility" pursuant to RSA 362:2 (Supp. 1991).

■ Normally, in reviewing PUC determinations, we give significant deference to the commission's factual findings. Under RSA 541:13, "all findings of the commission upon all questions of fact properly before it shall be deemed to be prima facie lawful and reasonable." *See also Appeal of Richards*, 134 N.H. 148, 158, 590 A.2d 586, 592, *cert. denied*, 112 S. Ct. 275 (1991). In this case, however, the PUC's finding that Atlantic was engaged in the "conveyance of telephone . . . messages," RSA 362:2 (Supp. 1991), was determinative of its own jurisdiction over the long-distance resale industry. We hold that such jurisdictional rulings are legal ones and subject to ordinary standards of judicial review. *See Mississippi Power v. Miss. ex. rel. Moore*, 487 U.S. 354, 386–87 (1988) (Brennan, J., dissenting). Accordingly, we will reverse the PUC order if Atlantic demonstrates "by a clear preponderance of the evidence before it, that such order is unjust or unreasonable." RSA 541:13; *see Richards supra.*

■ We hold that the PUC's finding that Atlantic was engaged in the "conveyance of telephone . . . messages," RSA 362:2 (Supp. 1991), and therefore subject to PUC jurisdiction as a public utility, was neither unjust nor unreasonable. As the previously cited excerpt indicates, the PUC based its determination on expert testimony presented over several days. Atlantic has failed to present sufficient evidence to rebut the PUC's finding that Atlantic's "network of its switch and leased lines convey[ed] the telephone message for the benefit of its customers."

Atlantic also contends that the PUC's decision is erroneous in light of *Appeal of Omni Communications, Inc.*, 122 N.H. 860, 451 A.2d 1289 (1982), because the PUC refused to limit its jurisdiction to natural monopolies. We believe that this claim, which turns on the interpretation of judicial precedent, involves a question of law. *Cf. Roy v. Water Supply Comm'n.*, 112 N.H. 87, 89, 289 A.2d 650, 652 (1972) (whether the water pollution commission had jurisdiction to deny the city's application to extend a city sewer line was a "question of law"); 2 F. COOPER, STATE ADMINISTRATIVE LAW 667 (1965) ("[I]f the court feels a superior competence in the premises, the question is classified as one of law."). Thus, the PUC's interpretation of *Omni* will be reversed if erroneous. R. WIEBUSCH, 5 NEW HAMPSHIRE PRACTICE, CIVIL PRACTICE AND PROCEDURE § 2090, at 532 (1984).

In *Omni*, this court reviewed both the legislative history of the creation of the PUC and the constitutional history of the enactment of part II, article 83 of the New Hampshire Constitution. *Omni, supra* at 861–63, 451 A.2d at 1290–91. Based on this historical back-

drop, we concluded "that in enacting RSA 362:2 the legislature did not intend to place all companies and businesses somehow related to railroads, telephone, telegraph, light, heat, and power companies under the umbrella of the PUC's regulatory power." *Id.* at 863, 451 A.2d at 1291. Next, we turned to the factual issue raised and held that the legislature did not intend to grant the PUC regulatory authority over radio-paging companies. *Id.* at 864, 451 A.2d at 1291–92. We based this holding on: (1) the legislature's prior rejection of legislation requiring radio-paging services to be regulated by the PUC; (2) an opinion of the attorney general that a community microwave tower could not be regulated by the PUC; (3) our finding that the PUC, by regulating telephone lines, insures the public that the radio-paging industry is not totally unregulated; and (4) our finding that the Federal Communications Commission would continue to regulate many radio-paging companies. *Id.* at 863–64, 451 A.2d at 1291–92.

■ ■ We disagree with Atlantic's contention that *Omni* limits the PUC's jurisdiction to natural monopolies. The *Omni* court's *dicta* that RSA 362:2 did not "place all . . . businesses somehow related to [utility companies] under the umbrella of the PUC's regulatory power," *id.* at 863, 451 A.2d at 1291, was not intended to establish a rule that the PUC could regulate only natural monopolies. Rather, it was meant to reconcile RSA 362:2 with the pro-competition ideals that prompted both the formation of the PUC and the enactment of part II, article 83 of the State Constitution. Had we meant to limit regulation only to natural monopolies, we would not have subsequently presented the four arguments showing that the legislature did not intend for RSA 362:2 to include radio-paging services. Instead, our analysis would have turned on whether or not the radio-paging industry was a natural monopoly. We hold, therefore, that *Omni* stands for the simple proposition that RSA 362:2 (Supp. 1991) does not apply to industries that the legislature did not intend to be regulated.

Atlantic's next claim concerns the *ex parte* relationship between the PUC staff and the commissioners. For the purposes of this appeal, we accept Atlantic's contention that attorneys who represented the PUC staff at the hearing subsequently assisted the commissioners in drafting reports and orders relating to the hearing.

In its notice of appeal and brief, Atlantic claims that this *ex parte* relationship violated RSA 541-A:21 (Supp. 1991) and due process under part I, article 15 of the New Hampshire Constitution. It did not implicate the due process clause of the Federal Constitution. Thus,

we need not consider the Federal Constitution on appeal. *State v. Field*, 132 N.H. 760, 764, 571 A.2d 1276, 1278 (1990).

■   Additionally, Atlantic failed to preserve its due process claim under part I, article 15 of the State Constitution. In *State v. Dellorfano*, 128 N.H. 628, 517 A.2d 1163 (1986), we stated that

"the defendant must fulfill two preconditions before triggering a State constitutional analysis: first, the defendant must raise the State constitutional issue below; second, the defendant's brief must specifically invoke a provision of the State Constitution."

*Id.* at 632, 517 A.2d at 1166 (citation omitted). Although Atlantic met the second requirement by specifically invoking part I, article 15 in its brief, it failed to articulate its State constitutional claim at the PUC proceedings below. In its motion for rehearing, Atlantic contended that the staff attorneys' participation in writing orders violated its "right to due process and a fair hearing." This contention does not meet the *Dellorfano* standard because it fails to even mention the State Constitution. *See Field, supra* at 763–64, 571 A.2d at 1278 (defense counsel's assertion that he had "some due process concerns" did not preserve the defendant's State due process claim); *see also* RSA 541:4 (motion for rehearing before commission "shall set forth every ground upon which it is claimed that the decision or order complained of is unlawful or unreasonable").

However, Atlantic's remaining claim under the *ex parte* communications provision of the Administrative Procedure Act, RSA 541-A: 21 (Supp. 1991), has been properly preserved and raised. RSA 541-A: 21 (Supp. 1991), enacted in 1983, was modeled after section 13 of the Uniform Law Commissioners' Model State Administrative Procedure Act of 1961. *See* MODEL STATE ADMIN. PROCEDURE ACT § 13, 15 U.L.A. 292 (1990). RSA 541-A:21 (Supp. 1991) provides:

"Unless required for the disposition of ex parte matters authorized by law, officials or employees of an agency assigned to render a decision or to make findings of fact and conclusions of law in a contested case shall not communicate, directly or indirectly, in connection with any issue before the agency, with any person or party, except upon notice and opportunity for all parties to participate. This notice requirement shall not apply to:
I. Communications between or among agency personnel, or between the agency and legal counsel; or

II. Communications between or among the presiding officer and one or more personal assistants."

The prohibition of *ex parte* communications was "intended to preclude litigious facts [from] reaching the deciding minds without getting into the record." MODEL STATE ADMIN. PROCEDURE ACT § 13 cmt., 15 U.L.A. 292 (1990). Further, the exemption for "communications between or among the presiding officer and one or more personal assistants," RSA 541-A:21, II (Supp. 1991), recognizes that in many state agencies "members are provided with personal assistants (like judicial law clerks) to help them in their task of appraising the record." 2 F. COOPER, STATE ADMINISTRATIVE LAW 441 (1965).

In its report and order rejecting Atlantic's motion for a rehearing, the PUC stated that its "normal practice is to deliberate orally first either during a public meeting or in executive session, RSA 91-A, and then to reduce its decision to writing subject to approval and signing at a public meeting . . . ." It then stated that this practice was followed after the Atlantic hearing and that "to the extent staff members assisted the commission by drafting orders in this docket, they acted subject to the commission's direction and final approval." Finally, it noted "that this practice serves to preserve the commission's impartiality and allows expeditious resolution of matters before the commission."

■ Atlantic does not dispute the PUC's account of the manner in which staff counsel participated in the preparation of orders and reports. Thus, we are called upon to determine whether RSA 541-A:21 (Supp. 1991) prohibits staff from participating in the preparation of orders *after* the commissioners have decided the outcome of the case. Clearly, the statute was not intended to reach so far. As noted earlier, the prohibition against *ex parte* communications was intended to prohibit information not presented in the presence of both parties from *influencing the agency's decision. See Henderson v. Department of Motor Vehicles*, 202 Conn. 453, 456–58, 521 A.2d 1040, 1041–42 (1987) (under Connecticut Administrative Procedure Act's *ex parte* communications section, the *ex parte* communication must prejudice the outcome). Here, the decision had already been made by the time the staff attorneys became involved. The staff attorneys simply reduced the commissioners' decision to writing. In so doing, they were acting as "personal assistants" to the commissioners. This function is deemed essential to the agency's adjudicative role and, as noted earlier, is explicitly permitted under RSA 541-A:21, II (Supp. 1991).

Accordingly, we hold that RSA 541-A:21 (Supp. 1991) was not violated.

*Affirmed.*

All concurred.