Public Utilities Commission
Nos. 00-637
      00-638

APPEAL OF CAMPAIGN FOR RATEPAYERS RIGHTS & a.

January 16, 2001

672

*Law Office of Joshua L. Gordon*, of Concord (*Joshua L. Gordon* on the brief and orally), for Campaign for Ratepayers Rights.

*Hall, Morse, Anderson, Miller & Spinella, PC*, of Concord (*Frank P. Spinella, Jr.* on the brief and orally), for Granite State Taxpayers.

*Sulloway & Hollis, P.L.L.C.*, of Concord (*Martin L. Gross* and *Timothy A. Gudas* on the brief, and *Mr. Gross* orally), and *Robert A. Bersak*, assistant general counsel of Public Service Company of New Hampshire, of Manchester, by brief, for Public Service Company of New Hampshire.

*Philip T. McLaughlin*, attorney general (*Stephen J. Judge*, associate attorney general, and *Wynn E. Arnold*, senior assistant attorney general, on the brief, and *Mr. Judge* orally), and *Foley, Hoag & Eliot, LLP*, of Boston, Massachusetts (*James K. Brown* on the brief), for the State.

PER CURIAM. The petitioners, Campaign for Ratepayers Rights (CRR) and Granite State Taxpayers (GST), appeal an order of the

New Hampshire Public Utilities Commission (PUC) approving a settlement agreement between the State and Public Service Company of New Hampshire (PSNH). We affirm.

This case has a long, complex history, which we do not repeat here. *See In re N.H.P.U.C. Statewide Elec. Util. Restructuring Plan*, 143 N.H. 233, 722 A.2d 483 (1998); *Petition of Public Serv. Co. of N.H.*, 130 N.H. 265, 539 A.2d 263 (1988), *appeal dismissed*, 488 U.S. 1035 (1989); *Appeal of Richards*, 134 N.H. 148, 590 A.2d 586, *cert. denied*, 502 U.S. 899 (1991). We recite facts relevant to only the current appeal.

PSNH, the State's largest public utility, has historically provided electric generation, transmission, and distribution services to New Hampshire residents. *See In re N.H.P.U.C.*, 143 N.H. at 234, 722 A.2d at 484. As such it has been a "vertically integrated" utility, providing all of these services as part of a "bundled" package.

In 1988, PSNH filed for bankruptcy, and in 1989, it entered into a rate agreement with the State that provided for fixed annual rate increases for seven years and permitted PSNH to include certain intangible deferred assets in its rates after the fixed rate period ended. *See id.* at 234-35, 722 A.2d at 484-85.

In 1996, the legislature enacted RSA chapter 374-F (the restructuring statute). *See* RSA 374-F:1, I (Supp. 2000). The restructuring statute directed the PUC to design a restructuring plan "in which electric generation services and rates would be extracted from the traditional regulatory scheme, unbundled, and subjected to market competition." *In re N.H.P.U.C.*, 143 N.H. at 236, 722 A.2d at 485. The goal of restructuring was to "create competitive markets that [would] produce lower prices for all customers than would have been paid under the [then-]current regulatory system." RSA 374-F:3, XI (Supp. 2000).

The PUC issued a final Statewide Restructuring Plan in 1997. *See In re N.H.P.U.C.*, 143 N.H. at 236, 722 A.2d at 486. PSNH and its affiliates challenged the plan in federal court, asserting that it violated numerous federal statutory and constitutional provisions. *See Public Service Co. of N.H. v. Patch*, 962 F. Supp. 222 (D.N.H. 1997); *Public Service Co. of New Hampshire v. Patch*, 173 F.R.D. 17 (D.N.H. 1997); *Public Service Co. of New Hampshire v. Patch*, 136 F.3d 197 (1st Cir. 1998); *Public Service Co. of New Hampshire v. Patch*, 167 F.3d 15 (1st Cir. 1998). This appeal concerns the agreement settling these lawsuits.

On April 19, 2000, after thirty-three days of hearings, the PUC initially approved the settlement agreement, conditioned upon the parties' acceptance of certain modifications. Numerous parties to

the proceeding, including the petitioners, filed motions for clarification and/or rehearing.

Effective June 12, 2000, the legislature enacted Laws 2000, chapter 249, which provides that, with some modifications, the April 19th order is in the public interest and which authorizes the PUC to approve a finance order implementing the modified agreement. *See* RSA 369-B:1, VII, IX (Supp. 2000); RSA 369-B:3, I (Supp. 2000).

The PUC then directed the settling parties to file a revised settlement agreement, incorporating the legislatively required changes. The PUC also directed parties that had moved for clarification or rehearing to file statements regarding the effect of the revised settlement agreement or the legislation on their motions. PSNH filed the revised settlement agreement on June 23, 2000. The PUC issued an order approving the revised settlement agreement and denying the petitioners' requests for rehearing on September 8, 2000. This appeal followed.

As a threshold matter, we address PSNH's assertion that the petitioners may not appeal the PUC's September 8th order because they neither responded to the PUC's June 12th directive nor requested rehearing upon all the grounds they now assert on appeal. We disagree.

"To appeal a decision or order of the PUC, one must first file a motion for rehearing with the PUC stating fully every ground upon which it is claimed that the decision or order complained of is unlawful or unreasonable." *Appeal of Richards*, 134 N.H. at 154, 590 A.2d at 590 (quotation omitted); *see* RSA 541:4 (1997). Upon denial of the motion for rehearing, the party may then appeal by petition to this court. *See* RSA 541:6 (1997).

■ The petitioners have generally complied with this statutory scheme. In response to the PUC's April 19th order, the petitioners timely moved for rehearing. The PUC denied these motions in its September 8th order, and the petitioners then timely appealed to this court. We address separately whether the petitioners have preserved all of their appellate arguments in the discussion that follows.

On appeal, the petitioners contend that the PUC erred by approving the agreement because it unlawfully permits PSNH to recover "stranded costs" from ratepayers.

■ "A party seeking to set aside or vacate an order of the PUC has the burden of demonstrating that the order is contrary to law or, by a clear preponderance of the evidence, that the order is unjust or unreasonable. In addition, findings of fact by the PUC are presumed

lawful and reasonable." *Appeal of Campaign for Ratepayers Rights*, 142 N.H. 629, 630, 706 A.2d 675, 677 (1998) (quotation omitted); *see* RSA 541:13 (1997). "When . . . we are reviewing agency orders which seek to balance competing economic interests . . . our responsibility is not to supplant the [PUC]'s balance of interests with one more nearly to our liking." *Appeal of Conservation Law Foundation*, 127 N.H. 606, 616, 507 A.2d 652, 659 (1986) (quotation, ellipses, and brackets omitted). We give the PUC's policy choices considerable deference. *See id.*

The settlement agreement defines "stranded costs" as

> [c]osts, liabilities, and investments that PSNH would rea-
> sonably expect to recover if the existing regulatory struc-
> ture with retail rates for the bundled provision of electric
> service continued, but which would likely not be recovered
> as a result of restructuring of the electric industry that
> allows retail choice of electricity suppliers unless a specific
> mechanism for such cost recovery is provided.

*See also* RSA 374-F:2, IV (Supp. 2000). Thus, what makes these costs "stranded" is the deregulation of generation services. *See Transmission Access Policy Study Group v. F.E.R.C.*, 225 F.3d 667, 699, 708 (D.C. Cir. 2000). Absent deregulation, PSNH would likely recover these costs through its rates. *See id.* at 707.

The agreement permits PSNH to recover stranded costs that consist of: (1) securitized assets; (2) "the net of ongoing expenses and/or revenue requirements (including decommissioning costs) for any generating [asset] that has not been sold or otherwise divested as of Competition Day"; and (3) non-securitized stranded costs. Competition Day is the date upon which all PSNH retail customers will be able to choose a competitive energy supplier.

The agreement requires PSNH to write off nearly $400 million of its stranded costs. In this way, the agreement requires PSNH's investors to bear a portion of its stranded costs. The agreement also permits PSNH to recover some of its stranded costs from customers by permitting it to charge them a stranded cost recovery charge as part of its unbundled delivery service. The agreement provides that the average level of the stranded cost recovery charge will be 3.40 cents per kilowatt-hour from Competition Day until the earlier of either the date upon which the non-securitized stranded costs are fully amortized or the Recovery End Date (October 31, 2007, or earlier, if certain events occur).

## I. *Constitutional Claims*

The petitioners assert that the stranded cost recovery charge is an unconstitutional "taking." *See* N.H. CONST. pt. I, art. 12. However, a constitutional argument, in this context, cannot be sustained unless the claim is that the entire rate is either unjust or unreasonable. A utility rate is constitutionally permissible if it is "just and reasonable." *Petition of Public Serv. Co. of N.H.*, 130 N.H. at 274, 539 A.2d at 268. "A just and reasonable rate is one that, after consideration of the relevant competing interests, falls within the zone of reasonableness between confiscation of utility property or investment interests and ratepayer exploitation." *Id.*

The petitioners do not contend that the entire rate is unjust and unreasonable. Rather, they focus upon one aspect of the rate, the stranded cost recovery charge. Such a piecemeal approach is impermissible. "[T]he constitution is only concerned with the end result of a rate order; *i.e.*, that it be just and reasonable. . . . [T]he particular ratemaking methodology employed by the regulatory agency is, for the most part, constitutionally irrelevant." *Id.* at 275, 539 A.2d at 268; *see also Duquesne Light Co. v. Barasch*, 488 U.S. 299, 313 (1989).

■ "Since [the petitioners] neither argue nor demonstrate that the total effect of the rate . . . is unjust or unreasonable, we hold that they have failed to sustain their burden of proof to show that the PUC's decision approving the rate . . . was unlawful or unreasonable." *Appeal of Richards*, 134 N.H. at 165, 590 A.2d at 596. In fact, it appears that the overall effect of the rate is well within the zone of reasonableness. Average rates under the agreement are projected to be approximately fifteen percent lower than they are now.

The petitioners next argue that including the stranded cost recovery charge is unconstitutional because it violates the "used and useful" principle of ratemaking. The "used and useful" principle requires that only property that is "used and useful in the generation of electricity" be included in a utility's rate base. *Id.* at 160, 590 A.2d at 593 (quotation omitted). This principle is not constitutionally mandated. *Petition of Public Serv. Co. of N.H.*, 130 N.H. at 279, 539 A.2d at 271. Thus, even were we to agree that the stranded cost recovery charge is associated with property that is no longer "used and useful," the PUC's decision to include this property in PSNH's rate base is not unconstitutional.

As part of its "used and useful" argument, GST asserts that because the stranded cost recovery charge constitutes payment for

past investment in generation assets, it is unconstitutional. We disagree. "To some degree, all utility rates reflect past costs; utilities typically expend funds today (for example, constructing generation facilities), fully expecting to recover these costs through future rates. In fact, current rates often include past costs that utilities deferred in order to avoid rate increases." *Transmission Access Policy Study Group*, 225 F.3d at 708.

■ CRR also argues that the rates set in the agreement are impermissible because, as of Competition Day, PSNH will no longer have a monopoly on generation service and the PUC has no jurisdiction to set rates in the absence of a monopoly. The PUC's regulatory authority is not, however, limited to monopolies. *See Appeal of Atlantic Connections*, 135 N.H. 510, 514, 608 A.2d 861, 864-65 (1992).

As part of this argument, CRR contends that the PUC's approval of the settlement agreement violates the constitutional right to free and fair competition. *See* N.H. CONST. pt. II, art. 83. CRR, however, did not make this argument in its motion for rehearing. Thus, it is not preserved for our review on appeal. *See Appeal of Atlantic Connections*, 135 N.H. at 515, 608 A.2d at 865.

GST argues that including "deferrals created by below-cost pricing of transition service" in the stranded cost recovery charge also violates the constitutional right to free and fair competition. GST also did not include this claim in its motions for rehearing and has not preserved it for our review on appeal. *See id.* The petitioners' remaining constitutional claims lack merit and warrant no further discussion. *See Vogel v. Vogel*, 137 N.H. 321, 322, 627 A.2d 595, 596 (1993).

## II. Statutory Claims

### A. RSA Chapter 374

GST argues that the PUC's order violates RSA chapter 374-F. We disagree.

Without specific reference to the record, GST asserts that as a result of the stranded cost recovery charge, "New Hampshire rates will stay high above [New England] regional rates." GST argues that this violates RSA 374-F:3, XI, which requires rates "[t]o the greatest extent practicable, . . . [to] approach competitive regional electrical rates." To the contrary, the record suggests that, after deregulation, average rates will be lower than they would have been absent deregulation, and will not only approach average regional rates, but may fall below them.

GST next argues that the agreement violates RSA 374-F:3, XII(d) (Supp. 2000), which requires that stranded costs be "reconciled to actual electricity market conditions from time to time," because it fixes the average stranded cost recovery charge for a period of time. As the State notes in its brief, the agreement, however, provides for periodic reconciliation of stranded costs consistent with RSA 374-F:3, XII(d).

GST next asserts that the stranded cost recovery charge is "discriminatory" because residential customers will pay stranded cost recovery charges that are seventeen percent higher than industrial customers will pay. GST contends that this violates RSA 374-F:3, XII(d), which requires stranded cost recovery to be accomplished through a "nondiscriminatory" charge that is "fair to all customer classes." GST also contends that it violates RSA 374-F:3, VI (Supp. 2000), which requires that the restructuring of the electric utility industry be implemented "in a manner that benefits all consumers equitably and does not benefit one customer class to the detriment of another" and that "[c]osts should not be shifted unfairly among customers."

GST points to no fact other than this percentage difference to support its conclusion that the stranded cost recovery charge is "discriminatory." This is insufficient. See *Transmission Access Policy Study Group*, 225 F.3d at 708. "The mere fact of a rate disparity is not enough to constitute unlawful discrimination." *Id.* (quotation and brackets omitted). Moreover, the legislature has found that this difference is in the public interest and consistent with RSA 374-F:3, VI. See RSA 369-B:1, X (Supp. 2000). As the legislature explained:

> When [the differences among rate classes in the stranded cost recovery charge] are combined with the differences in the delivery service charge among rate classes, and with the differences in the likely market price of energy among rate classes, the overall total rate reduction is likely to be very close to an equal percentage for all rate classes, which is consistent with the benefits to all customers principle of RSA 374-F:3, VI.

RSA 369-B:1, X. To the extent that the difference conflicts with RSA chapter 374-F, RSA 369-B:1, X controls. See *In re N.H.P.U.C.*, 143 N.H. at 240-41, 722 A.2d at 488.

GST argues that the PUC's finding that the stranded cost recovery charge complies with RSA 374-F:3, XII(d) is unsupported

by the record. The PUC, however, set forth at length the record evidence that supports its conclusion.

■ GST's contention that the PUC was required to undertake a "full-blown cost analysis" to calculate the stranded cost recovery charge is also unavailing. No such cost analysis was required. *See* RSA 374-F:4, V (Supp. 2000) (permitting PUC to set stranded cost recovery charges in context of adjudicated settlement proceeding).

B. RSA Chapter 378

CRR asserts that the settlement agreement violates RSA 378:18-a, I (Supp. 2000). We disagree.

RSA 378:18-a, I, precludes electric utilities from recovering from their non-special contract customers the difference between the rate afforded special contract customers and the regular tariffed rate, unless the PUC determines that this recovery is "in the public interest and equitable to other ratepayers."

■ CRR argues that non-special contract customers are paying higher stranded cost recovery charges than they would pay were it not for PSNH's special contracts. CRR points to no evidence to support this assertion. Nor does it point to any evidence that the stranded cost recovery charges paid by non-special contract customers somehow make up for the shortfall caused by the special contract rates. To the extent that CRR claims that the rates set by the agreement make up for this revenue shortfall, its claim is premature. *See Appeal of Campaign for Ratepayers Rights*, 142 N.H. at 632, 706 A.2d at 678. In its order, the PUC refused to adjust the "Company's revenue requirements for alleged shortfalls in receipts associated with Special Contract customers during the initial delivery service period," stating that it will examine this issue in the rate case PSNH must file after the end of the initial period. *Cf.* RSA 369-B:1, XV.

*Affirmed.*

BROCK, C.J., and NADEAU and DALIANIS, JJ., concurred.