Public Utilities Commission
No. 2001-107

APPEAL OF THE OFFICE OF THE CONSUMER ADVOCATE

(New Hampshire Public Utilities Commission)

Argued: March 13, 2002
Opinion Issued: July 25, 2002

*Michael W. Holmes*, consumer advocate (*Mr. Holmes* and *F. Anne Ross*, assistant consumer advocate, on the brief, and *Mr. Holmes* orally), for the petitioner.

*Gerald M. Eaton*, of Manchester, by brief and orally, for respondent Public Service Company of New Hampshire.

*Stebbins, Lazos & Van Der Beken P.A.*, of Manchester (*Henry B. Stebbins* on the brief), and *Gottesman & Hollis, P.A.*, of Nashua (*Anna Barbara Hantz* on the brief), for respondent Freudenberg-NOK General Partnership.

NADEAU, J. The petitioner, the Office of the Consumer Advocate (OCA), appeals from a decision of the New Hampshire Public Utilities Commission (PUC) denying the OCA's motion for hearing regarding the approval of an amendment to a special contract between the respondents, Freudenberg-NOK and Public Service Company of New Hampshire (PSNH). The OCA contends that the PUC's approval of the amendment by

order *nisi* denied ratepayers their statutory right to a hearing. *See* RSA 365:28 (1995)(amended 2001). Further, because the order *nisi* does not provide a hearing to first establish cause, the OCA argues that it violates the due process rights of ratepayers. We affirm.

PSNH and Freudenberg-NOK entered into a special contract in 1995, under which PSNH provided discounted energy rates to Freudenberg-NOK as an incentive to install new molding equipment, thereby expanding production at Freudenberg-NOK's Bristol plant. On January 4, 1995, pursuant to RSA 378:18 (Supp. 2001), the PUC found the discounted energy rates were in the public interest and approved the special contract by Order No. 21,484.

On April 10, 2000, PSNH submitted to the PUC a first amended contract, requesting that the discounted energy rates approved for the Bristol plant be extended to include Freudenberg-NOK's new plants in Laconia and Franklin. Other than augmenting the base energy demand incorporated in the original special contract to reflect the addition of the two new facilities, the terms and conditions of the amended contract were the same. On September 5, 2000, the PUC approved the amended special contract. By order *nisi*, No. 23,546, the PUC found the amended special contract to be in the public interest and "consistent with the original intent of the parties and with our approval of the underlying contract." The PUC ordered that all interested parties be notified that they may submit comments or file a request for a hearing no later than September 29, 2000.

The OCA timely filed a motion for hearing, arguing, among other things, that the amended special contract is a new contract. Pursuant to RSA 378:18-a, III (Supp. 2001), new special contracts designed to attract load must meet the requirements of RSA 378:18 (Supp. 2001). RSA 378:18 allows for discount rates if "special circumstances exist which render such departure from the general schedules just and consistent with the public interest." In addition, the PUC must determine that the normal tariffed rate is not sufficient to attract load. *See* RSA 378:18-a, III. For numerous reasons, the OCA contended that the amended special contract did not meet the requirements established in RSA 378:18 and RSA 378:18-a, III.

In considering the OCA's motion for hearing, the PUC concluded that New Hampshire statutory law did not require that a finding of "special circumstances," pursuant to RSA 378:18, be reached after a hearing. The PUC also rejected the OCA's argument that the amended special contract was a new contract. Accordingly, on January 29, 2001, the PUC issued Order No. 23,627, denying the OCA's motion for hearing. The OCA filed this appeal.

Before turning to the merits, we first note a procedural issue presented by OCA's appeal. This appeal is governed by RSA chapter 541. *See* RSA

365:21 (1995). RSA 541:4 precludes any appeal under RSA chapter 541 to this court by a party who has not applied for a rehearing before the agency. *See* RSA 541:4 (1997). The same section restricts the scope of the appeal to the grounds raised in the motion for rehearing, unless this court expands the scope for good cause shown. The reason for these requirements is obvious: administrative agencies should have a chance to correct their own alleged mistakes before time is spent appealing from them. *See Appeal of White Mts. Educ. Ass'n*, 125 N.H. 771, 774 (1984).

It appears from the language of RSA 541:4 that the legislature did not consider its application to administrative decisions issued by order *nisi*. It is not clear from the statute whether a party is required to move for rehearing in a matter that was not initially subject to a hearing. Accordingly, we have chosen not to dismiss the present appeal on procedural grounds. However, hereafter, all administrative decisions subject on appeal to the constraints of RSA 541:4 are nevertheless similarly constrained when issued by order *nisi* or when otherwise issued without a hearing. In the future, when a record does not demonstrate that the appealing party has met the requirements of that section, we may decline the appeal or dismiss it on our own motion. *See Appeal of White Mts. Educ. Ass'n*, 125 N.H. at 775.

Turning to the merits, we note that a party seeking to set aside or vacate an order of the PUC has the burden of demonstrating that the order is contrary to law or, by a clear preponderance of the evidence, that the order is unjust or unreasonable. In addition, findings of fact by the PUC are presumed lawful and reasonable. *See Appeal of Campaign for Ratepayers Rights*, 145 N.H. 671, 674-75, *cert. denied*, 533 U.S. 916 (2001); RSA 541:13 (1997). When reviewing agency orders that seek to balance competing economic interests, our responsibility is not to supplant the PUC's balance of interests with one more nearly to our liking. *See Appeal of Campaign for Ratepayers Rights*, 145 N.H. at 675. We give the PUC's policy choices considerable deference. *See id.*

Given the deference we accord the PUC in such matters, we affirm its determination that the amended special contract was not a new contract, but rather an amendment to the original 1995 contract. Persuasive is the PUC's finding that

> the production processes which were the justification for the original contract have been physically transferred to new locations, leaving a lower monthly demand and usage at the Bristol facility. Neither the base demand levels, nor any terms of the agreement have been modified other than the geographic

location of the Seals Division. Thus, we do not agree that this scenario creates a new contract.

The provisions of RSA 378:18-a, III, therefore, do not apply. Nor does RSA 365:28 apply — it requires a hearing only when the PUC seeks to "alter, amend, suspend, annul, set aside or otherwise modify any order made by it." The PUC's original 1995 Order No. 21,484 remains unchanged and in effect. The current action concerns the amendment of the special contract at issue in Order No. 21,484, not the order itself. As the amendment to the special contract has been approved by a separate order, RSA 365:28 is inapplicable here.

Thus, the only remaining issue we need address is whether residential utility customers have a statutory or due process right to a hearing when the PUC approves an amendment to a previously approved special contract.

RSA 541-A:31, in pertinent part, requires adjudicative proceedings when a matter is considered a "contested case." See RSA 541-A:31 (1997 & Supp. 2001). "Contested case" is defined as "a proceeding in which the legal rights, duties, or privileges of a party are required by law to be determined by an agency after notice and an opportunity for hearing." RSA 541-A:1, IV (Supp. 2001). As RSA 378:18 governs special contracts for service, the language contained therein determines whether there is here a contested case for which an adjudicatory proceeding is required.

When a statute's language is plain and unambiguous, we need not look beyond it for further indication of legislative intent. See State v. Comeau, 142 N.H. 84, 86 (1997). RSA 378:18 requires that the PUC determine that "special circumstances exist which render such departure from the general schedules just and consistent with the public interest." However, nothing in the plain language of the statute requires the PUC to determine "special circumstances" after a hearing. Thus, unless opportunity for a hearing is required by due process, the proceeding at issue is not a "contested case."

The OCA contends that the PUC's decision to approve the amended special contract without the benefit of a hearing was a violation of due process under both the Federal and State Constitutions. We analyze the OCA's constitutional claims first under the New Hampshire Constitution, referencing federal decisions only for the purpose of aiding our State constitutional analysis. See State v. Cannuli, 143 N.H. 149, 151 (1998). Because Part I, Article 15 of the New Hampshire Constitution is at least as protective of the ratepayers' rights as the Due Process Clause of the Fourteenth Amendment, cf. Knowles v. Warden, N.H. State Prison, 140 N.H. 387, 389 (1995), we do not engage in a separate federal analysis. See State v. Ball, 124 N.H. 226, 232 (1983).

When determining whether challenged procedures satisfy the due process requirement of the State Constitution, we consider three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*In re Richard A.*, 146 N.H. 295, 298 (2001) (quotation omitted).

In addressing the first factor, we determine whether the interest at stake is a protected liberty or property interest. *See Appeal of Plantier*, 126 N.H. 500, 506 (1985). The OCA has not claimed the interest at stake is a liberty interest, so we limit our focus to whether the governmental benefit conferred is a protected property interest under Part I, Article 15. *See id.* "The hallmark of property ... is an individual entitlement grounded in state law, which cannot be removed except 'for cause.'" *Duffley v. N.H. Interschol. Ath. Assoc., Inc.*, 122 N.H. 484, 491 (1982) (quoting *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430 (1982)). It is long settled that

> [p]roperty interests ... are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law rules — or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Riblet Tramway Co. v. Stickney*, 129 N.H. 140, 146 (1987). Therefore, the applicable law, RSA chapter 378, will determine whether the OCA asserts a protected property interest.

RSA chapter 378 governs the rates and charges exacted by New Hampshire public utilities. The provisions of RSA chapter 378 sometimes require that the PUC provide notice and a hearing before rendering a decision. *See, e.g.*, RSA 378:7, :27 (1995). Other provisions of RSA chapter 378, however, do not require the PUC to provide notice and a hearing. *See, e.g.*, RSA 378:18, :18-a. When the statutory scheme does not require a hearing prior to rendering a decision, that decision, although subject to statutory constraints, is nevertheless left to the discretion of the PUC. It has been held that "the existence of provisions that retain for the state significant discretionary authority over the bestowal ... of a government

benefit suggests that the recipients of such benefits have no entitlement to them." *Senape v. Constantino*, 936 F.2d 687, 690 (2d Cir. 1991).

Federal courts have consistently determined that utility customers do not have a vested property interest in the setting of utility rates sufficient to invoke the procedural protections of the Fourteenth Amendment. U.S. CONST. amend. XIV, § 1; *see, e.g., Wright v. Central Ky. Gas Co.*, 297 U.S. 537, 542 (1936); *Georgia Power Project v. Georgia Power Company*, 409 F. Supp. 332, 338-41 (N.D. Ga. 1975); *Sellers v. Iowa Power and Light Company*, 372 F. Supp. 1169, 1171-72 (S.D. Iowa 1974); *Holt v. Yonce*, 370 F. Supp. 374, 376-78 (D. S.C. 1973), *aff'd*, 415 U.S. 969 (1974). Several States have also declined to recognize a utility customer's due process property interest in the setting of utility rates. *See, e.g., Indus. Utility Customers v. Ky. Utilities*, 983 S.W.2d 493, 497 (Ky. 1998); *CEPA v. Water Dept. Com'r*, 575 A.2d 160, 162-64 (Pa. Commw. Ct. 1990), *aff'd*, 600 A.2d 322 (Pa. 1992).

Consistent with the aforementioned jurisdictions, we hold that the PUC's decision to approve the amended special contract without a hearing was not a violation of due process.

*Affirmed.*

BRODERICK, J., sat for oral argument but did not take part in the final vote; BROCK, C.J., and DALIANIS and DUGGAN, JJ., concurred.