Public Utilities Commission
No. 2004-400

APPEAL OF PINETREE POWER, INC. & a.
(New Hampshire Public Utilities Commission)

Argued: February 16, 2005
Opinion Issued: April 4, 2005

*Brown, Olson & Wilson, P.C.*, of Concord (*Robert A. Olson & a.* on the brief, and *Bryan K. Gould* orally), for Pinetree Power, Inc., Pinetree Power-Tamworth, Inc., Bridgewater Power Company, L.P., and Hemphill Power & Light Company.

*Linda T. Landis & a.*, of Manchester, on the brief, and *Ms. Landis* orally, for Public Service Company of New Hampshire.

*F. Anne Ross*, consumer advocate (*Ms. Ross* and *Rorie Hollenberg*, staff attorney, on the brief, and *Ms. Ross* orally), for Office of Consumer Advocate.

*Kelly A. Ayotte*, attorney general, and *Donald M. Kreis*, staff attorney, public utilities commission (*Wynn E. Arnold*, senior assistant attorney general, and *Mr. Kreis* on the brief, and *Mr. Arnold* orally), for the State, as *amicus curiae*.

GALWAY, J. Four intervenors—Pinetree Power, Inc., Pinetree Power-Tamworth, Inc., Bridgewater Power Company, L.P., and Hemphill Power & Light Company (collectively, Wood Plants)—appeal a decision of the New Hampshire Public Utilities Commission (PUC) granting Public Service of New Hampshire's (PSNH) petition to modify one of its energy generation assets. We affirm.

PSNH, the State's largest public utility, has historically provided electric generation, transmission, and distribution services to New Hampshire residents. *Appeal of Campaign for Ratepayers Rights*, 145 N.H. 671, 673, *cert. denied*, 533 U.S. 916 (2001). It provides retail electric service to more than seventy percent of New Hampshire's residents. PSNH's generating assets include Schiller Station in Portsmouth. Schiller's three units (Nos. 4, 5 and 6) burn oil and coal to produce electricity.

The Wood Plants are four wood-fired electric generating plants in New Hampshire that sell their output to PSNH under long-term rate orders. *See Appeal of Public Serv. Co. of N.H.*, 130 N.H. 285 (1988). Upon the

expiration of those rate orders over the next few years, the Wood Plants could compete with PSNH for sales in the wholesale energy market.

In August 2003, PSNH petitioned the PUC for authority to modify Schiller Unit 5 so that it could burn wood as well as fossil fuels (Schiller Project), asserting that the Schiller Project would be in the "public interest of PSNH's retail customers." PSNH offered five justifications for the Schiller Project: (1) enhancing the State economy by creating a sustainable market for low-grade wood; (2) improving air quality by reducing air emissions; (3) aiding the region's renewable energy market with a source of Renewable Energy Credits (RECs); (4) maintaining economic and power reliability; and (5) increasing fuel diversity and thus energy security. Supporters of the Schiller Project proposal included, among others, the New Hampshire Timberland Owners' Association, the Society for the Protection of New Hampshire Forests, the Audubon Society, the New Hampshire Department of Resources and Economic Development, the State Forester, the Office of Consumer Advocate, and numerous legislators.

The Wood Plants intervened in the PUC proceeding, asserting that their rights or interests may be adversely affected by the Schiller Project due to: (1) the competition the project would create for the same low-grade wood supplies that the Wood Plants purchase; and (2) any possible increase in rates paid by the Wood Plants to purchase back-up power from PSNH when the Wood Plants' generators are not operating.

Following four days of hearings, the PUC determined that the modification would not be in the public interest of PSNH's retail customers because of the cost recovery terms proposed by PSNH, but held that the modification could be in the public interest of PSNH's retail customers and the public, in general, if PSNH met certain additional conditions detailed in the order. Those conditions concerned how to allocate the risks and rewards associated with the project's incremental costs and incremental revenues.

To address the PUC's concerns over the cost-recovery methodology for the Schiller Project, PSNH, the Officer of Consumer Advocate, the Office of Energy and Planning, and the New Hampshire Timberland Owners Association (Joint Movants) filed a joint motion for reconsideration proposing a simplified cost recovery mechanism that contained a risk-sharing plan based upon the PUC's order. The Wood Plants objected to the motion and filed a motion for rehearing, to which PSNH objected.

Following a hearing, the PUC granted the Joint Movants' motion for reconsideration and denied the Wood Plants' motion for rehearing. The

PUC found the proposed Schiller Project, as conditioned by the terms set forth in the reconsideration motion, to be in the public interest of PSNH's retail customers as required by RSA 369-B:3-a.

The Wood Plants raise three issues in their appeal of the PUC's approval of PSNH's Schiller Project: (1) that the PUC's determination that the Schiller Project is in the public interest of PSNH's retail customers was either unlawful or unreasonable; (2) that the PUC's orders fail to comply with the requirements of RSA 541-A:35; and (3) that the PUC does not have rate-making authority to approve a cost recovery methodology pursuant to RSA 369-B:3-a. We address each issue in turn.

The Wood Plants first contend that PSNH failed to establish that the proposed modification of Schiller Unit 5 is in the public interest of its retail customers. We disagree.

A party seeking to set aside an order of the PUC has the burden of demonstrating that the order is contrary to law or, by a clear preponderance of the evidence, that the order is unjust or unreasonable. *Appeal of Campaign for Ratepayers Rights*, 145 N.H. at 674. Findings of fact by the PUC are presumed lawful and reasonable. *Id.* at 674-75. When we are reviewing agency orders that seek to balance competing economic interests, our responsibility is not to supplant the PUC's balancing with one more nearly to our liking. *Id.* at 675. We give the PUC's policy choices considerable deference. *Id.*

The Wood Plants assert that the objective of the relevant statutory scheme is to afford New Hampshire residents rate relief. Accordingly, they contend that PSNH cannot modify or retire its generating facilities unless doing so is in the "public interest of PSNH's retail customers," *see* RSA 369-B:3-a (Supp. 2004), and that the interest to which the PUC is to give priority is rate relief. Specifically, the Wood Plants argue that PSNH's customers "must have more to gain from [a modification] than they stand to lose" or, a "net benefit," and that PSNH failed to prove this benefit.

The PUC regulates divestiture and modification of PSNH's generation assets pursuant to RSA 369-B:3-a. The statute states:

> The sale of PSNH fossil and hydro generation assets shall not take place before April 30, 2006. Notwithstanding RSA 374:30, subsequent to April 30, 2006, PSNH may divest its generation assets if the [PUC] finds that it is in the economic interest of retail customers of PSNH to do so, and provides for the cost recovery of such divestiture. Prior to any divestiture of its

generation assets, PSNH may modify or retire such generation assets if the [PUC] finds that it is in the public interest of retail customers of PSNH to do so, and provides for the cost recovery of such modification or retirement.

RSA 369-B:3-a.

To the extent that a dispute raises a new issue of statutory interpretation, we begin our inquiry with the examination of statutory language. *Appeal of Ashland Elec. Dept.*, 141 N.H. 336, 338 (1996). We interpret statutes not in isolation, but in the context of the overall statutory scheme. *Id.* at 340. Where statutory language is ambiguous, we examine the statute's overall objective, and give substantial deference to the interpretation of those charged with its administration. *Id.*

RSA 369-B:3-a is a clear directive by the legislature to the PUC specifically regarding PSNH. Here, after extensive testimony and evidence, the PUC determined the Schiller Project to be in the public interest of retail customers of PSNH, stating:

Thus, because the project yields certain overall public policy goods such as economic benefits and environmental improvements, common sense suggests a positive contribution to the RSA 369-B:3-a evaluation of the effect on PSNH's retail customers. This positive contribution, combined with the likelihood of customer-favorable rate effects, are [*sic*] the basis of our determination that the project is in the public interest of retail customers of PSNH.

Although RSA 369-B:3-a does not define what constitutes the "public interest" of PSNH's retail customers, the statutes governing utility restructuring are instructive. Title 34 of the New Hampshire statutes encompasses chapters 362-382 and governs public utilities. RSA chapter 369-A governs electric rate reduction financing, and RSA chapter 369-B governs electric rate reduction financing and functions of the PUC. The legislature stated that the purpose of restructuring electric utilities includes providing "greater competition and more efficient regulation," "increased customer choice," and electric service at "lower and more competitive rates." RSA 369-A:1, I (Supp. 2004). Similarly, the legislature stated that one of the purposes of RSA chapter 369-B is providing retail electric service at "lower costs," and facilitating competition. RSA 369-B:1, I, II (Supp. 2004). Thus, the customer benefits of restructuring clearly include rate relief.

■ RSA chapter 374-F also governs electric utility restructuring. *See* RSA ch. 374-F (Supp. 2004). According to this chapter, customer benefits of restructuring include "health and environmental benefits." RSA 374-F:3, V(f)(5) (Supp. 2004). Further, in addition to being consistent with New Hampshire energy policy as set forth in RSA 378:37 (1995), commitments to renewable energy resources are to "be balanced against the impact on generation prices" and can have "significant environmental, economic, and security benefits." RSA 374-F:3, IX (Supp. 2004). This statutory scheme supports the conclusion that the "public interest" of PSNH's customers encompasses more than simply rates.

■ The legislative history of RSA 369-B:3-a is also instructive. The Schiller Project was the type of project contemplated by the legislature in its drafting, revisions, and hearings on Senate Bill 170. The wording of the statute, from its original drafting to its final language is especially helpful. As originally introduced, the bill stated:

> The sale of PSNH fossil and hydro generation assets shall not take place during the transition service period defined in RSA 369-B:3, IV(b)(1)(B). Subsequent to this period, PSNH may divest, expand, or retire its generation assets if the [PUC] finds that it is in the economic interest of retail customers of PSNH to do so, and provides for the cost recovery of such divestiture, expansion, or retirement.

When finalized, SB 170 provided that the *divestiture* of PSNH generation assets may occur only "if the [PUC] finds that it is in the *economic* interest of retail customers of PSNH to do so . . . ." RSA 369-B:3-a (emphasis added). The standard of review for a generating station *modification* was amended to read: "PSNH may modify or retire such generation assets if the [PUC] finds that it is in the *public* interest of retail customers of PSNH to do so, and provides for the cost recovery of such modification or retirement." *Id.* (emphasis added). Thus, whereas divestiture of PSNH's generating assets after 2006 will require an analysis of the economic interests of customers, modifications to PSNH's generation assets require an analysis of the public interest of its retail customers. *See id.* By the plain language of the statute, the public interest standard for modification is broader than just economic interests.

■ We conclude that the PUC applied the correct "public interest" standard required by the statute. We find no basis in either the statutory scheme or case law to apply the "net benefits" test asserted by the Wood

Plants. Because the Wood Plants have failed to demonstrate that the PUC's application of the public interest test to the Schiller Project was unjust or unreasonable, we hold that the Wood Plants have failed to sustain their burden of proof.

The Wood Plants next argue that the PUC's orders do not conform to the requirements of RSA 541-A:35. Specifically, the Wood Plants argue that the PUC's findings that the Schiller Project was in the public interest of PSNH's retail customers lacked the "necessary predicate findings that the project conferred a net benefit on the ratepayers and that the project was the best alternative to obtain the same claimed benefits." As for the findings the PUC did make, the Wood Plants argue that the PUC "failed to identify the evidence upon which it relied or failed to explain how it reconciled its findings with uncontested contradictory evidence." Accordingly, the Wood Plants argue that the orders "fail to provide an adequate basis upon which this court can evaluate the PUC's decision."

RSA 541-A:35 requires the PUC to make detailed findings of fact and conclusions of law to support its determination. *See* RSA 541-A:35 (Supp. 2004); *Petition of Support Enforcement Officers*, 147 N.H. 1, 9 (2001). The PUC was required to make findings sufficiently detailed to provide this court with an adequate basis upon which to review its decision. *See Petition of Support Enforcement Officers*, 147 N.H. at 9.

While the PUC must include in a final order "[t]he positions of each party on each issue," RSA 363:17-b, II (1995 & Supp. 2004), the PUC's orders clearly reflect that it did not "solely" summarize the evidence, as the Wood Plants contend. *See Petition of Support Enforcement Officers*, 147 N.H. at 9. Here, the PUC's five orders issued in conjunction with the proceedings of the Schiller Project demonstrate that the PUC relied upon evidence elicited from extensive proceedings that included testimony and exhibits. This detailed evidence as reflected in the orders included the underlying facts and testimony submitted by the parties, the positions of the parties, the PUC's examination and analysis of the facts and evidence, and the governing statutes. In fact, the Wood Plants concede that the PUC relied upon record evidence, in the form of an expert report commissioned by PSNH predicting $19.3 million in annual economic effects on the local economy.

The PUC's findings of fact and conclusions of law are thorough and consistent with the record evidence. The PUC explicitly found that: (1) PSNH's project cost estimate was reasonable; (2) the PUC staff's estimates of the incremental revenue to be generated by the Schiller Project were reasonable; (3) PSNH and PUC staff estimates of rate relief

from the Schiller Project were reasonable; and (4) there were multiple benefits of the Schiller Project, including the existence of a sustainable market for low-grade wood products, lower emissions at Schiller Station, adding to the fuel diversity of power sources, and improved reliability of the unit.

Further, in its orders, the PUC reviewed the extensive history from its previous orders, outlined the arguments of the parties, assessed the respective arguments, analyzed the experts' opinions, and drew conclusions. The PUC rejected the Wood Plants' contention that the record lacked evidence as to project benefits and stated that the case was based upon the extent to which the PUC found credible the predictions of the parties' experts about how the project would perform in two markets—the market for electricity and the market for RECs. The PUC concluded, based upon the evidence presented, that the project would yield certain economic benefits and environmental improvements, and that these positive contributions, combined with the likelihood of customer-favorable rate effects, were the basis of its determination that the project was in the public interest of PSNH's retail customers.

 We thus conclude that the Wood Plants did not demonstrate any legal insufficiency in the PUC's orders, and that the PUC made detailed findings of fact and conclusions of law sufficient for our review. *See* RSA 541-A:35.

Finally, the Wood Plants argue that because RSA 369-B:3-a only contemplates a cost recovery for any approved modification, the PUC lacked the authority to allow PSNH financial incentives to undertake the modification.

The PUC is required by statute to provide a cost recovery methodology for modifications found to be in the public interest of its retail customers, but the legislature has not prescribed what type of cost recovery is required. *See* RSA ch. 369-B. The legislature has, however, granted the PUC "the general supervision of all public utilities and the plants owned, operated or controlled by the same so far as necessary to carry into effect the provisions of this title." RSA 374:3 (1995). RSA 374:3-a, entitled "Alternative Forms of Regulation; Incentive Regulation," states:

> Upon petition of a regulated utility ... and after notice and hearing, the [PUC] may approve alternative forms of regulation other than the traditional methods which are based upon cost of service, rate base and rate of return, provided that any such alternative results in just and reasonable rates and provides the

utility the opportunity to realize a reasonable return on its investment.

In determining the rates, the PUC is to be the "arbiter between the interests of the customer and the interests of the regulated utilities." RSA 363:17-a (1995).

■ Here, the PUC required a sharing of the risks and rewards that were estimated to result from approval of the Schiller Project. This balancing of the customers' and PSNH's interests was both legally permitted, *see* RSA 374:3, :3-a, and required, *see* RSA 363:17-a. Accordingly, the PUC appropriately used its rate-making authority to approve the joint cost recovery proposal. We conclude, therefore, that the Wood Plants failed to meet their burden of proof that the PUC acted beyond its authority in approving the proposed incentive cost recovery methodology.

*Affirmed.*

BRODERICK, C.J., and NADEAU, DALIANIS and DUGGAN, JJ., concurred.