2000 UT 1

US WEST COMMUNICATIONS,
INC., Petitioner,

v.

PUBLIC SERVICE COMMISSION
OF UTAH, Respondent.

No. 980082.

Supreme Court of Utah.

Jan. 7, 2000.

Rehearing Denied Feb. 25, 2000.

Thomas M. Dethlefs, Michael C. Thompson, Denver, Colo., and Jay T. Jorgensen, David Jordan, Gregory B. Monson, Salt Lake City, for petitioner.

Jan Graham, Att'y Gen., Sander J. Mooy, Laurie L. Noda, Asst. Att'ys Gen., Salt Lake City, for respondent.

Jan Graham, Att'y Gen., Michael L. Ginsberg, Douglas C. Tingey, Kent Walgren, Asst. Att'ys Gen., Salt Lake City, for intervenors Committee of Consumer Services and Division of Public Utilities.

RUSSON, Justice:

¶ 1 Petitioner U.S. West Communications, Inc., seeks review of an order of the Utah Public Service Commission denying a

requested increase in telephone rates. We affirm.

## BACKGROUND

¶ 2 U.S. West Communications, Inc. ("US West"), is a public utility corporation that provides telecommunications services. The rates it charges for its services in Utah are regulated by the Public Service Commission. *See* Utah Code Ann. §§ 54–8b–1 to –18 (1994 & Supp.1999). The Commission determines the revenue required to operate U.S. West and fixes its rates at levels that cover its operating expenses and provide a reasonable return on investment. *See id.* § 54–7–12(2)(b); *Utah Dep't of Bus. Reg. v. Public Serv. Comm'n*, 614 P.2d 1242, 1248 (Utah 1980).

¶ 3 On April 8, 1997, U.S. West filed an application with the Commission seeking a statewide rate increase of $84.8 million. In connection with its application, U.S. West requested that the Commission discontinue its practice of "directory imputation," which consists of imputing to U.S. West profits from the directory publishing business of U.S. West Dex ("Dex"). Dex publishes telephone directories (White Pages and Yellow Pages) in which businesses purchase advertising. Imputing Dex's profits to U.S. West enables the Commission to maintain lower U.S. West rates. US West asserted that under *Committee of Consumer Services v. Public Service Commission*, 595 P.2d 871, 878 (Utah 1979) ("*Wexpro I* "), Dex's publishing operations are not utility operations and, therefore, the Commission has no authority to order directory imputation.

¶ 4 The Commission conducted general rate proceedings pursuant to section 54–8b–2.4(3)(a) of the Utah Code. On December 4, 1997, it issued a report and order authorizing an annual rate increase of $683,417. In its report and order, the Commission rejected U.S. West's arguments regarding directory imputation and calculated the increase on the basis of continued imputation of Dex's profits. On rehearing, the Commission granted an additional rate increase of $231,674, but

did not alter its position respecting directory imputation. The Commission denied the remainder of U.S. West's requested rate increase.

¶ 5 In its report and order, the Commission concluded that under *Wexpro I*, Dex's directory publishing operations are utility operations, the profits from which should be applied to offset U.S. West's revenue requirements and lower its rates. The Commission reached this conclusion primarily on the basis that historically in Utah, both the directory publishing services at issue as well as telecommunications services were provided by the same utility, AT & T. Prior to court-ordered divestiture, AT & T monopolized the market. Revenues from its directory publishing were included in its overall revenue requirement. In 1982, the reorganization of AT & T was approved. US West took over the telecommunications services, and on January 1, 1984, the directory publishing operations were transferred to Dex.[1] The Commission has never approved the transfer of directory publishing operations, but neither has it sought to formally invalidate the transfer. Instead, the Commission has simply treated the directory publishing business as part of U.S. West's regulated operations for purposes of setting U.S. West's rates.

¶ 6 U.S. West directly petitioned this court for review of the Commission's decision pursuant to section 78–2–2(3)(e)(i) of the Utah Code. U.S. West maintains that under *Wexpro I*, Dex's directory publishing business is not a utility operation subject to Commission regulation and, consequently, directory imputation is improper. US West further argues that by imputing revenues to U.S. West, the Commission did not comply with the legislature's policy goal of moving telecommunications rates toward the actual cost of service and removing subsidies. *See* Utah Code Ann. § 54–8b–2.4(1)(c) (Supp. 1999). Next, U.S. West asserts that directory imputation constitutes an unconstitutional "taking" of private property and violates principles of due process. Finally, U.S. West

---

1. The directory publishing operations were actually transferred to U.S. West Direct. Since 1984, the directory operations have been part of U.S. West Direct, the Media Group of U.S. West, and U.S. West Dex. For clarity, we refer to the directory publishing business at issue as "Dex."

contends that under *Wexpro I*, even if the directory publishing operations are utility operations, the Commission must limit directory imputation to the fair market value of those operations at the time of their transfer to Dex. These arguments raise questions of law for which we accord the Commission no deference. *See Williams v. Public Serv. Comm'n*, 754 P.2d 41, 50 (Utah 1988).

## DISCUSSION

¶ 7 "[T]he Commission has no inherent regulatory powers other than those expressly granted or clearly implied by statute." *Mountain States Tel. & Tel. Co. v. Public Serv. Comm'n*, 754 P.2d 928, 930 (Utah 1988). By statute, the Commission is

vested with power and jurisdiction to supervise and regulate every public utility in this state, and to supervise all of the business of every such public utility in this state, and to do all things, whether herein specifically designated or in addition thereto, which are necessary or convenient in the exercise of such power and jurisdiction.

Utah Code Ann. § 54–4–1 (1994). Where a company engages in both utility and nonutility businesses, the Commission may regulate only its utility services. *See id.* § 54–2–1(19)(d).[2] Thus, if Dex's directory publishing business is not a public utility operation, the Commission has no authority to regulate it and may not impute its profits to U.S. West.

¶ 8 The legislature has defined public utilities to include telephone corporations that provide public telecommunications services. *See id.* §§ 54–2–1(19)(a),[3] 54–8b–1 to –18 (1994 & Supp.1999). "Public telecommunications services" are "the two-way transmission of signs, signals, writing, images, sounds, messages, data, or other information of any nature by wire, radio, lightwaves, or other electromagnetic means offered to the public generally." *Id.* § 54–8b–2(12) (Supp. 1999). Under these definitions, telephone directory publishing businesses, by themselves, are not public utilities.[4] However,

under this court's decision in *Wexpro I*, where a public utility has held or operated properties which in and of themselves would not constitute utility assets (such as directory publishing), they are nonetheless deemed public utility assets or operations subject to Commission regulation if certain criteria are met. *See* 595 P.2d at 876–79. Because of the historical connection between U.S. West's public telecommunications services and Dex's directory publishing operations, our determination of whether Dex's directory publishing is a utility operation is guided by *Wexpro I*.

¶ 9 In *Wexpro I*, Mountain Fuel Supply Company ("MFS"), a natural gas utility company, proposed a transfer of certain oil-producing properties to its nonregulated and wholly owned subsidiary, Wexpro Company. *See id.* at 873–75. Providing natural gas was a regulated utility service; producing oil was not. MFS classified the properties to be transferred as "non-utility" assets in part because they produced a greater value of oil than gas. *See id.* at 876. The Commission ruled that MFS's classification was valid and that, as a result, it had no jurisdiction over the transfer of "non-utility" assets to an unregulated entity. *See id.* at 873.

¶ 10 This court reversed the Commission and remanded the case for determination of whether the properties at issue were utility assets, irrespective of MFS's own classification. *See id.* at 877–78. The court supplied the following criteria for making that determination:

(1) Was the property, while undeveloped, held in the utility capital account ... upon which a rate of return was paid by the ratepayers?

(2) Were any funds from the utility exploration and development expense accounts ... applied to the development of the [oil producing property]?

(3) Has any natural gas or natural gas liquids been produced from the [oil producing property]?

---

**2.** This provision is now found at Utah Code Ann. § 54–2–1(14)(c) (Supp.1999).

**3.** This provision is now found at Utah Code Ann. § 54–2–1(14)(a) (Supp.1999).

**4.** The record indicates that of the various telephone directory publishing businesses in this state, the only one regulated by the Commission is Dex.

*Id.* at 878. The court explained, "If the answer *to any* of these is in the affirmative, the assets are utility property. Any transfer of a utility asset [to an unregulated entity] should be for fair market value so an appropriate benefit therefrom will redound to the credit of the ratepayers." *Id.*

¶ 11 Following remand, MFS, Wexpro, and the Division of Public Utilities reached a settlement agreement and applied for the Commission's approval. *See Utah Dep't of Admin. Servs. v. Public Serv. Comm'n,* 658 P.2d 601, 604 (Utah 1983) (*"Wexpro II "*). The Commission approved the agreement, and the matter once again came before this court for review. *See id.* This court upheld the settlement agreement, concluding that it adequately resolved issues concerning the extent of the MFS ratepayers' interest in the oil-producing properties and provided that gas rates would be reduced by revenues from those properties. *See id.* at 607, 616.

■ ¶ 12 Although the *Wexpro I* criteria were specifically tailored to assessing the character of the particular assets at issue in that case, they provide guidance in the instant case for determining whether U.S. West's directory publication assets are utility assets subject to the Commission's regulatory authority. Under *Wexpro I,* ratepayers have an investment or proprietary interest in assets held by a utility if those assets (i) were developed or augmented in some manner by ratepayer funds (first and second *Wexpro I* criteria) or (ii) contributed to the production of utility property (third *Wexpro I* criterion). *See Wexpro I,* 595 P.2d at 878; *see also Wexpro II,* 658 P.2d at 613, 616 (referring to ratepayers' "investment" interest and "proprietary interest" in assets). When a transfer of such assets occurs for inadequate compensation, the difference between the amount paid and the fair market value of the assets may appropriately be made up by imputing revenues from the unregulated entity to the utility for rate-setting purposes. *See Wexpro I,* 595 P.2d at 878 (requiring transfer of

utility assets at fair market value); *Wexpro II,* 658 P.2d at 616 (upholding settlement whereby utility rates would be offset by profits from assets transferred to unregulated entity).

¶ 13 Our determination of whether U.S. West ratepayers have an investment or proprietary interest in Dex's publishing operations turns in large measure on the historical union of telecommunications and directory publishing services. AT & T originally provided telephone directories in conjunction with its telecommunications services. AT & T was a monopoly. The record indicates that AT & T's Utah operating company, Mountain States Telephone & Telegraph Company ("Mountain Bell"), provided these services without competition from any other telecommunications or directory publishing company "for many decades prior to AT & T's breakup and divestiture." During this period, Mountain Bell did not account separately for its directory publishing operations.

¶ 14 In 1982, the reorganization of AT & T was approved, resulting in AT & T's directory publishing and telecommunications operations being placed with regional holding companies. *See United States v. American Tel. & Tel. Co.,* 552 F.Supp. 131, 225–27 (D.D.C.1982). In Utah and other western states, those combined operations were placed with U.S. West Incorporated.[5] Shortly thereafter, on January 1, 1984, the operations split; directory publishing was transferred to Dex (the "1984 transfer"), and U.S. West retained control over telecommunications services.[6]

¶ 15 Hence, at the time of the 1984 transfer, U.S. West ratepayers had an investment or proprietary interest in the directory publishing operations. Before the transfer, those operations were an integral part of telecommunications services. Telephone directories were necessary for customers to make use of the telecommunications network. As a result of AT & T's monopoly, however, customers had no other telephone directory

---

**5.** US West Incorporated is U.S. West's parent company.

**6.** Since the 1984 transfer, through directory imputation, the Commission essentially has fixed U.S. West's rates as if the transfer did not occur.

The record indicates, for example, that in 1994 over 90 percent of Dex's net income in Utah from Yellow Pages advertising was imputed to U.S. West to reduce rates.

available to them. Likewise, local businesses had no other directories in which to advertise. Directory publishing inevitably increased accessibility to, and the usefulness of, telecommunications services which, in turn, increased the usage and circulation of telephone directories, making advertising therein more marketable. Telecommunications services and directory publishing operations each helped expand and develop the other. Moreover, the record shows that prior to AT & T's breakup, Mountain Bell's directory publishing expenses were included with its other utility operation expenses. Ratepayer funds were applied without distinction to support and develop both telecommunications services and directory publishing operations. Directory publishing assets were part of Mountain Bell's rate base, and a return on investment was allowed on those assets. Thus, the Commission did not err in concluding that under the *Wexpro I* criteria, the directory publishing operations transferred to Dex were utility operations.

¶ 16 This conclusion is consistent with that reached by other jurisdictions addressing similar arguments. Those jurisdictions have also determined that U.S. West ratepayers have a compensable interest in Dex's directory publishing operations. In *US West Communications, Inc. v. Washington Utilities & Transportation Commission*, 134 Wash.2d 74, 949 P.2d 1337, 1350 (1997) ("*Washington Rate Case*"), U.S. West argued against directory imputation, contending that Dex should be free from regulation as are other directory publishing companies. In response, the Washington Supreme Court stated:

The fact is that the Company is different from other [directory publishing] companies competing for the business. The record shows that U.S. West did not develop this lucrative business by its initiative, skill, investment or risk-taking in a competitive market. Rather, it did so because

it was the sole provider of local telephone service, and as such owned the underlying customer databases and had established business relationships with virtually all of the potential advertisers in the yellow pages.... The record indicates that the billing and collection service provided to [Dex] by U.S. West is a valuable business advantage to [Dex]. The record also indicates that in contrast with potential publishing competitors, [Dex's] publishing enjoys a unique and direct benefit by being associated with the Company's regulated telecommunications services. The affiliated transactions of U.S. West's competitors do not present an analogous public policy issue because competitors lack the formidable and historical dominance in the local exchange market that U.S. West possesses.

*Id.* The Washington court further noted that, at the time of its decision, thirteen of fifteen state regulatory jurisdictions in U.S. West's service area imputed income from Dex's publishing operations to U.S. West in setting rates.[7] *See id.* at 1350 n. 8.

¶ 17 In a similar vein, the Colorado Supreme Court stated:

[W]e reject Mountain Bell's characterization of its publishing operations as purely private. The directory publishing business was developed over the past fifty years within the protective shelter of Mountain Bell's monopoly of telephone service. The assets were included in the base upon which Mountain Bell was permitted to earn a return. Mountain Bell concedes that the Yellow Pages always have generated "supra competitive" profits. It is an exaggeration to say that Mountain Bell's shareholders took any significant risk in developing the directory publishing business, and we find the public interest in those assets to be beyond dispute.

---

7. *See, e.g., In re Minnesota Pub. Util. Comm'n,* 417 N.W.2d 274, 285–86 (Minn.Ct.App.1987); *Attorney General v. New Mexico State Corp. Comm'n,* 121 N.M. 156, 909 P.2d 716, 722 (1995); *Pacific Northwest Bell Tel. Co. v. Katz,* 121 Or.App. 48, 853 P.2d 1346, 1349–50 (1993). Directory imputation has also been upheld when other telecommunications utilities have trans-

ferred directory publishing operations to unregulated affiliates. *See, e.g., Rochester Tel. Corp. v. Public Serv. Comm'n,* 87 N.Y.2d 17, 637 N.Y.S.2d 333, 660 N.E.2d 1112, 1116–18 (1995); *State ex rel. Util. Comm'n v. Southern Bell Tel. & Tel. Co.,* 307 N.C. 541, 299 S.E.2d 763, 765–67 (1983); *Turpen v. Oklahoma Corp. Comm'n,* 769 P.2d 1309, 1327–28 (Okla.1988).

*Mountain States Tel. & Tel. Co. v. Public Util. Comm'n,* 763 P.2d 1020, 1027–28 (Colo. 1988) (citations omitted). We agree with the reasoning of these courts. Under the principles we announced in *Wexpro I*—as applied to the "supra competitive" nature of phone directories originally established during monopolistic circumstances—Dex's directory operations are utility assets subject to the Commission's authority.[8]

¶ 18 We likewise reject U.S. West's argument that directory imputation may not continue indefinitely. This argument assumes that the initial transfer of directory publications to Dex constituted a one-time "sale" of the directory publishing assets and that directory imputation must cease once the value of those assets has been paid for. However, as the Commission noted, the key distinction between *Wexpro I* and the instant case is that, with respect to the latter, the Commission's "treatment of directory operations since 1985 has been as if the operations had been retained by [US West]. The directory operations imputation approach used by the Commission meets the goal of the *Wexpro I* decision by keeping customers in the same position as they were prior to the transfer."

¶ 19 In other words, because the Commission retains jurisdiction over utility assets, it may choose the remedy for a transfer of those assets to a purportedly unregulated affiliate. Where the Commission chooses to effectively acknowledge the transfer as a sale, as it did in *Wexpro I*, the appropriate compensation for the ratepayers' interest is the payment of fair market value. *See Wexpro I,* 595 P.2d at 878 (requiring transfer of utility assets at fair market value); *see also Washington Rate Case,* 949 P.2d at 1352 (where utilities commission had originally acknowledged one-time sale of directory publications assets, imputation should cease once fair compensation has been received).

¶ 20 In this case, however, the Commission has never acknowledged the validity of U.S. West's transfer of its publishing assets, and has instead chosen to essentially regulate those assets as if the transfer had never taken place. It was U.S. West's burden to demonstrate that this remedy exceeded the Commission's authority. The Commission specifically found that U.S. West failed to meet this burden, stating:

> While there is record evidence of the fair market value, the parties have presented limited evidence or testimony useful to determine a one-time appropriate benefit to apply for ratepayers in the *Wexpro I* context or that it would be in the public interest. [US West's] approach is solely on the elimination of any treatment based upon its erroneous conclusion that *Wexpro I* does not apply. [US West] does not present an alternative argument if its *Wexpro I* argument is wrong. [Some parties] contend that the directory operations imputation treatment continues to be an appropriate treatment. Other parties are silent on the matter. None of them argues that the past Commission treatment should be ended and replaced with a one-time adjustment.... The [Committee of Consumer Services'] calculation [of fair market valuation] is presented solely to counter [US West's] ostensible position of a one-time adjustment of $0. The Committee does not advocate a one-time adjustment. With the limited record developed for us, we decline to replace our past treatment of directory operations with a one-time adjustment in this rate case. Continuation of the directory operations imputation achieves the end that is dictated by *Wexpro I.*

We agree with the Commission's reasoning on this point. US West failed to meet its burden of contesting the Commission's regulatory remedy for transfer of its utility assets to Dex. Instead, U.S. West placed all its eggs in one basket by fixedly asserting that Dex's directory operations were not utility assets and could not be regulated in any manner. We therefore decline to overrule the Commission's refusal to replace continued imputation with a one-time adjustment based on fair market valuation at the time of transfer.

8. Because U.S. West's statutory and constitutional arguments are premised upon its flawed assertion that its directory publications are not utility assets, those arguments likewise fail and we decline to treat them.

## CONCLUSION

¶ 21 Under the principles announced in *Wexpro I,* Dex's directory publishing operations are utility assets subject to the Commission's regulatory authority. Moreover, U.S. West did not meet its burden of demonstrating that the Commission violated its regulatory authority with its current practice of directory imputation. We therefore affirm.

STEWART, Justice, concurring:

¶ 22 I concur in the Court's opinion affirming the Public Service Commission's ruling that the directory publishing assets are "utility assets" and that imputation of the profits from these assets should continue to inure to the benefit of ratepayers. I write separately, however, to emphasize the importance of continuing the imputation of revenues. The Commission's action prevents U.S. West from cherry picking the most profitable assets and diverting the profits therefrom to its shareholders.

¶ 23 The facts that gave rise to the instant case originated in 1984 when U.S. West spun off its directory publishing assets to an affiliated, unregulated corporation, U.S. West Dex. U.S. West did not seek or obtain, then or at any time, an order from the Commission permitting that transfer. The Commission quite properly required U.S. West to impute the revenues and expenses from the directory publishing assets to U.S. West's utility operations, thereby protecting the interests of ratepayers. Thus, to achieve fairness to the ratepayers and to be true to its regulatory duties, the Commission treated Dex's assets as if they were utility assets still owned by U.S. West. The Commission, in its report and order, properly identified the real issue here:

> It is also the basis of the concern expressed by the Commission in the 1985 rate case that U.S. West would attempt to segment itself into discrete operations, spin off the most profitable ones to its affiliates and leave the laggards within its utility operations.

The Commission then observed:

> Since 1985, we have seen U.S. West try to do exactly this or position itself to do so in the future.

¶ 24 U.S. West's actions are not unique to its Utah operations. In *Mountain States Telephone & Telegraph Co. v. Public Utilities Commission,* 763 P.2d 1020 (Colo.1988), the Colorado Supreme Court stated:

> In the AT & T divestiture case, *United States v. American Tel. & Tel. Co.,* 552 F.Supp. 131, the court rejected a proposal that directory publishing assets should be transferred from the Bell operating companies such as Mountain Bell to AT & T. The court determined that the assets should remain with the operating companies, in part because profits from Yellow Pages revenues were used to subsidize rates charged to local telephone customers as a means of furthering the goal of universal telephone service. *United States v. American Tel. & Tel. Co.,* 552 F.Supp. at 194. Indeed, as many as thirty states use Yellow Pages profits for this purpose. *State ex rel. Util. Comm'n v. Southern Bell Tel. & Tel. Co.,* 307 N.C. 541, 299 S.E.2d 763, 765 (1983). When the divestiture court again addressed this issue in 1984, it observed with dismay that the intent of its 1982 order had been circumvented by the acts of regional holding companies (such as U.S. West, Inc.) transferring publishing assets from the local operating companies to unregulated subsidiaries. *United States v. Western Elec. Co., Inc.,* 592 F.Supp. at 866.

763 P.2d at 1031–32.

¶ 25 The majority opinion in the instant case acknowledges that telecommunications services and directory publishing operations each "helped expand and develop the other." *Supra* ¶ 15. The opinion also acknowledges that prior to AT & T's breakup, Mountain Bell included the directory publishing expenses in its utility operation expenses, that revenues from the publication of directories were included in Mountain Bell's telecommunications revenues, and that *ratepayer* funds were "applied without distinction to support and develop both telecommunications services and directory publishing operations. *Directory publishing assets were part of Mountain Bell's rate base,* and *a return on investment was allowed on those assets."*

*Supra* ¶ 15 (emphasis added). More to the specific point of this opinion, the Public Service Commission held that the directory publishing operations were in fact "utility operations," and the majority opinion affirms that conclusion. The Commission stated:

> We cannot make the distinction that USWC does relative to the Yellow Pages listings. *Customers of USWC's telephone service receive automatic listing in the alphabetical and the classified portions of the directory. Customers must pay extra charges not to be listed. Both the alphabetical and the classified listings facilitate use of USWC's telephone service.* We disagree with USWC's attempt to distinguish the existence of alternative providers of directories in the current case from the circumstances in *Wexpro I.* One must remember that in *Wexpro I,* the contested assets were those that were classified as oil wells under Mountain Fuel Supply's classification system. These oil wells produced oil, natural gas and other hydrocarbon products. Alternative, non-utility providers of oil wells, natural gas, oil, and other hydrocarbon products existed in *Wexpro I,* just as there are non-utility providers of directories in the current case.
>
> We reject the distinction that USWC tries to make relative to Yellow Pages advertising with the existence of other providers of directories and what USWC characterizes as competing advertising media. Indeed, a considerable amount of the evidence presented on the directory publication matter has been directed to competition in directory publication, competitive alternatives that may or may not exist with respect to directories and, specifically, yellow pages, and information on market shares. In the context of the *Wexpro I* analysis, this evidence appears irrelevant.

(Emphasis added.)

¶ 26 The Commission stated: "Parties that presented evidence explored the relationship between directories and the other services provided by USWC. Many witnesses argue that directories are part of the utility's functions and responsibilities. USWC's position is that publishing directories is not a utility function." The Commission squarely ruled—correctly so—that with respect to the directory operations and assets, "we must conclude that they were utility operations and utility assets."

¶ 27 Perhaps circumstances will change to such a remarkable degree that the publishing assets would no longer be utility assets and a one-time transfer would be permissible. As things currently exist, however, the cessation of imputation of revenues would unfairly transfer the benefit of present and future profits from the ratepayers to the shareholders. *See Mountain States,* 763 P.2d at 1031–32.

¶ 28 Chief Justice HOWE, Associate Chief Justice DURHAM, and Justice ZIMMERMAN concur in Justice STEWART'S concurring opinion.