Public Utilities Commission
No. 2004-785

APPEAL OF VERIZON NEW ENGLAND, INC. d/b/a VERIZON NEW HAMPSHIRE
(New Hampshire Public Utilities Commission)

Argued: September 14, 2005
Opinion Issued: December 28, 2005

*McLane, Graf, Raulerson & Middleton, P.A.*, of Concord (*Steven V. Camerino* and *Sarah B. Knowlton* on the brief, and *Mr. Camerino* orally), and *Bruce P. Beausejour* and *Victor D. Del Vecchio*, of Boston, Massachusetts, on the brief, for the petitioner.

*Kelly A. Ayotte*, attorney general (*Wynn E. Arnold*, senior assistant attorney general, on the brief and orally), and *Edward N. Damon*, of Concord, on the brief, for the State.

*F. Anne Ross*, consumer advocate (*Ms. Ross* and *Rorie E.P. Hollenberg*, staff attorney, on the brief, and *Ms. Ross* orally), for the Office of Consumer Advocate, as *amicus curiae*.

DALIANIS, J. Verizon New England, Inc. d/b/a Verizon New Hampshire (Telephone Company) appeals an order of the New Hampshire Public Utilities Commission (PUC) requiring the imputation of at least $23.3 million earned by the Telephone Company's unregulated affiliate, Verizon Yellow Pages Company (Directory Company), for ratemaking purposes. We affirm.

The publication of telephone directories has been an integral part of the telecommunications business for over a century. Traditionally, telephone directories have been comprised of "White Pages," an alphabetical listing of subscribers and their telephone numbers, and "Yellow Pages," a section devoted to advertisements sold by the publisher. Prior to 1984, AT&T, through a regulated regional operating company, compiled, published and distributed telephone directories for New Hampshire "in house," and Yellow Pages operations and revenues belonged entirely to the regional operating company. The Yellow Pages business earned the company "supra-competitive" profits. *United States v. American Tel. and Tel. Co.*, 552 F. Supp. 131, 193 (D.C. 1982), *aff'd*, 460 U.S. 1001 (1983). All revenues, expenses and assets associated with directory operations were included in the regulated books of the regional operating company.

In 1984, pursuant to a consent decree arising from major anti-trust litigation, AT&T divested itself of twenty-two regional operating companies, including the Telephone Company. *See id.* at 141, 222-25. The divested operating companies were permitted to retain their Yellow Pages print businesses. *Id.* at 194. At divestiture, the Telephone Company elected to transfer assets associated with directory operations to the Directory Company, a non-regulated affiliate.

Although the Telephone Company no longer published a telephone directory, it was still required to provide a compilation of subscriber listings—the "White Pages"—to all of its customers. N.H. ADMIN. RULES, PUC 405.04. The Telephone Company, therefore, entered into a directory

publishing agreement with the Directory Company (1984 DPA). Under the 1984 DPA, the Telephone Company granted the Directory Company the exclusive right during the term of the agreement to contact the Telephone Company's subscribers for the purposes of soliciting and obtaining directory advertising for publication in telephone directories. The Directory Company agreed to compile, print and publish telephone directories for distribution to the Telephone Company's subscribers, and further *agreed to pay annual publishing fees* to the Telephone Company. The agreement was to remain in force for five years, after which it would be automatically renewed on a yearly basis, subject to termination by either party on one year's notice.

On July 12, 1985, the PUC issued an order allowing the 1984 DPA to go into effect without modification. The PUC noted, however, that it would continue to monitor the relationship between the Telephone Company and the Directory Company, and it reserved the right to take further regulatory action as warranted. The order also directed the Telephone Company to provide the PUC with updated information about changes in the terms and conditions of the 1984 DPA, including information about income derived from Yellow Pages.

The 1984 DPA remained in effect from January 1, 1984, through December 30, 1990. In November 1990, the Telephone Company and the Directory Company entered into a Directory License Agreement, effective January 1, 1991 (1991 DLA), with the intent of replacing the 1984 DPA. The Telephone Company granted the Directory Company an exclusive license to use its name in soliciting directory advertising, as well as to use its name, slogans, and marks in publishing and distributing directories. The 1991 DLA also granted the Directory Company the exclusive right to designate its directories as the "official" directories of the Telephone Company. As consideration for this license, the Directory Company *agreed to pay* the Telephone Company *an annual fee* based upon the revenues generated by its telephone directory publishing endeavors.

The 1991 DLA, like the 1984 DPA it superseded, was to remain in force for five years, after which it would be automatically renewed on a yearly basis, subject to termination by either party on one year's notice. The PUC, finding the agreement "just and reasonable," issued an order on March 6, 1991, approving it without modification.

In 1996, Congress adopted the Telecommunications Act of 1996, 47 U.S.C.A. §§ 151 *et seq.* (2001 & Supp. 2005), which, among other things, required telephone service providers to furnish subscriber list information "under nondiscriminatory and reasonable rates, terms and conditions" to any person requesting such information for directory publishing purposes. 47 U.S.C. § 222(e) (2000). The Telephone Company had followed such a

non-discriminatory policy from the time of the 1984 divestiture in its listings licensing agreements. On December 9, 1997, the Directory Company notified the Telephone Company that it was terminating the 1991 DLA as of January 1, 1999. It cited the "important changes in the relationships between telecommunications service providers and directory providers" required by the Telecommunications Act of 1996 as its primary motivation for doing so.

On December 23, 1998, the Directory Company and the Telephone Company executed an amendment to the 1991 DLA (1999 amendment), effective as of January 1, 1999, allowing the 1991 DLA to remain in effect. Under the 1999 amendment, the exclusive licenses granted to the Directory Company were restricted to Maine, as were its obligations to make revenue sharing payments to the Telephone Company. The Telephone Company failed to file the 1999 amendment with the PUC. On December 24, 1998, the Directory Company notified the Telephone Company that it was postponing termination of the 1991 DLA to January 1, 2000. On January 1, 2000, the companies again postponed termination to March 31, 2000, to allow for more time to execute a new directory publishing agreement.

In early 2000, the Telephone Company and the Directory Company entered into a new directory publishing agreement (2000 DPA) and a listings license agreement (2000 LLA), which were filed with the PUC on March 8, 2000. Under the 2000 DPA, the Directory Company agreed to fulfill the Telephone Company's continuing regulatory obligations with respect to the publication and distribution of telephone directories. The Directory Company was given the right to sell advertising "in any section" of the directories, and the Telephone Company would have no rights or interest in any revenues received by the Directory Company in connection with the sale of directory advertising.

The 2000 LLA granted the Directory Company a non-exclusive license to use the Telephone Company's listing information for directory use, and the Telephone Company reserved the right to issue similar licenses to other parties. Unlike the 1984 DPA and the 1991 DLA, the 2000 LLA *did not require* the Directory Company to *pay any fees or to share revenues* from directory advertising sales as part of the licensing fee arrangement. The 2000 DPA was to remain in force for two years, after which it would be automatically renewed on a yearly basis, subject to termination by either party on one year's notice. The 2000 LLA was valid for one year, was automatically renewable on a yearly basis, and could be terminated by either party upon ninety days' notice.

In October 2001, the PUC commissioned an audit of the Telephone Company. The auditor concluded that the Telephone Company's parent

company, Verizon, Inc., removed Yellow Pages revenues from the Telephone Company without the express permission of the PUC, that the PUC had not approved the Telephone Company's existing contract in which it had no rights or interest in Yellow Pages revenues, and that the Yellow Pages business would likely have substantial value were it to be sold in an arm's length transaction.

On the basis of the audit, the PUC initiated a proceeding to determine the proper regulatory treatment of Yellow Pages revenues in New Hampshire, and whether or not the Telephone Company retained, or should have retained, any rights or interest in those revenues.

On July 9, 2004, the PUC issued an order finding that the 2000 DPA did not compensate the Telephone Company and its ratepayers for the value derived by the Directory Company from its association with the Telephone Company. The PUC concluded that the 1999 amendment was a modification of an affiliate contract, and that because it was not filed with the PUC pursuant to RSA 366:3 (1995), it was unenforceable in New Hampshire. It further determined that the 1991 DLA was not validly terminated before 1999, and that revenue sharing payments under the 1991 DLA with respect to New Hampshire Yellow Pages operations were improperly terminated in 1999. The PUC also concluded that, as a matter of law, the Telephone Company could not unilaterally relinquish the value derived from Yellow Pages or the right to contribution arising therefrom on behalf of itself or its ratepayers.

The PUC determined that the appropriate remedy was to impute at least $23.3 million of the Directory Company's revenues to the Telephone Company. Rather than order the direct payment of $23.3 million from the Directory Company to the Telephone Company, the PUC ordered that imputation be effectuated by a line item adjustment on the Telephone Company's financial statements. The PUC also assessed a civil penalty upon the Telephone Company in the amount of $1,000 for failing to file the 1999 amendment.

The Telephone Company raises three issues in its appeal of the PUC's order: (1) the PUC erred as a matter of law in ruling that the 2000 DPA was unjust and unreasonable because it did not reserve for the benefit of the Telephone Company and its ratepayers any value from the directory publishing enterprise; (2) the PUC erred as a matter of law in imputing at least $23.3 million in revenues earned by the Directory Company to the Telephone Company; and (3) the PUC unsustainably exercised its discretion by imposing a $1,000 penalty upon the Telephone Company for its failure to file the 1999 amendment. We address each issue in turn.

## I. *The 2000 DPA*

A party seeking to set aside an order of the PUC has the burden of demonstrating that the order is contrary to law or, by a clear preponderance of the evidence, that the order is unjust or unreasonable. *See* RSA 541:13 (1997); *see also Appeal of Pinetree Power*, 152 N.H. 92, 95 (2005). Findings of fact by the PUC are presumed *prima facie* lawful and reasonable. RSA 541:13; *Appeal of Pinetree Power*, 152 N.H. at 95. "When we are reviewing agency orders which seek to balance competing economic interests[,] our responsibility is not to supplant the PUC's balance of interests with one more nearly to our liking. We give the PUC's policy choices considerable deference." *Appeal of Campaign for Ratepayers Rights*, 145 N.H. 671, 675 (2001) (quotation, ellipses, and brackets omitted).

### A. *The 1991 DLA and 1999 Amendment*

The Telephone Company first argues that the PUC erred as a matter of law by ruling that "the 1991 DLA was not validly terminated" after concluding that "the Telephone Company had unilaterally terminated the [1991 DLA] and relinquished its right to payments under it." The Telephone Company points out that it was, in fact, the Directory Company that attempted to terminate the contract, as was its right under section 6.1 of the 1991 DLA. After a thorough review of the record, we believe that the Telephone Company misreads the PUC's order.

Any contract or arrangement entered into between a public utility and an affiliate providing for the furnishing of services, or any modification thereof, must be filed by the public utility with the PUC within ten days after the date upon which the contract or arrangement is reached. RSA 366:3 (1995). Any contract or arrangement not filed in accordance with RSA 366:3 is not enforceable in New Hampshire. RSA 366:4 (1995). The 1999 amendment, eliminating revenue sharing payments under the 1991 DLA, was not filed with the PUC as mandated by RSA 366:3, and, thus, was unenforceable under RSA 366:4. The PUC, therefore, concluded that:

> [B]ecause the 1999 Amendment [was] unenforceable in New Hampshire under RSA 366:4 and the 1991 DLA was not validly terminated before 1999, revenue sharing payments under the 1991 DLA with respect to New Hampshire Yellow Pages operations were improperly terminated during calendar year 1999.

The PUC further concluded that the Telephone Company "did not, nor could it unilaterally relinquish on its behalf, or on behalf of ratepayers, the

value derived from Yellow Pages publication nor the right to contribution arising from such opportunity . . . ."

■ Contrary to the Telephone Company's assertion, the PUC order does not state that "the 1991 DLA was not validly terminated," nor does it take the position that the Telephone Company unilaterally terminated it. It states that the 1991 DLA was not validly terminated *before 1999*—an incontestably valid conclusion, as the 1991 DLA was not terminated until early 2000, when it was superseded by the 2000 agreements. Because the 1999 amendment was unenforceable under RSA 366:4, it could not and did not modify the terms of the 1991 DLA, which remained in effect until its termination in early 2000. Thus, the termination of revenue sharing payments under the 1991 DLA in 1999 was, indeed, improper. Whether the PUC erroneously characterized the Telephone Company's decision to surrender its rights and interest in Yellow Pages revenues under the 1999 amendment and, thereafter, the 2000 agreements as a "unilateral" one is irrelevant to the outcome of the matter before us.

### B. Collateral Estoppel

■ The Telephone Company next argues that the PUC was "collaterally estopped" from ruling that the termination of the 1991 DLA and the revenue sharing agreement therein was unreasonable because it had approved the 1991 DLA and its termination provisions without modification in March of 1991. The PUC's order, however, makes no such ruling. Rather, the PUC ruled that the 2000 DPA that superseded the 1991 DLA was unjust and unreasonable. That the PUC may have approved the termination provisions of a contract between a public utility and an affiliate does not preclude it from exercising its regulatory authority over future agreements between the same parties. *See* RSA 366:5 (1995).

The PUC has the full power and authority to investigate any contract, arrangement, purchase, or sale between a public utility and an affiliate; the public utility and affiliate bear the burden of proving the reasonableness of the transaction. RSA 366:5. If the PUC, after notice and hearing, finds that any such contract or arrangement is unjust or unreasonable, it "may make such reasonable order relating thereto as the public good requires." *Id.* It may disapprove any such contract or arrangement and disallow payments thereunder it finds unjust and unreasonable. *Id.*

■ Exercising its investigative authority under RSA 366:5, the PUC determined that the Directory Company continued to derive significant value from its association with the regulated Telephone Company, and that the Telephone Company and its ratepayers deserved to be compensated. The PUC rejected the Telephone Company's contention that the

Telecommunications Act of 1996 required the termination of revenue sharing payments. The PUC concluded that the 2000 DPA, in reserving all of the value of the association between the Directory Company and the Telephone Company for stockholders and not ratepayers, did not represent an arm's length transaction. It accordingly found that the 2000 DPA was unjust and unreasonable. For the reasons discussed above, we conclude that it was not collaterally estopped from doing so.

### C. Evidentiary Support

■ The Telephone Company asserts that the PUC failed to identify any "legal or evidentiary" grounds in support of its conclusion that a value continued to flow to the Directory Company as a result of its alleged association with the Telephone Company, and that the Telephone Company and its ratepayers deserved to be compensated accordingly. It cites no authority placing the burden upon the PUC to make such a showing. We believe that, in taking this position, the Telephone Company misconstrues the authority of the PUC under RSA 366:5, which gives the PUC full investigative authority and places the burden of proving the reasonableness of a contract on the public utility and its affiliate. *See* RSA 366:5. Nonetheless, a thorough review of the record convinces us that the PUC did, in fact, identify numerous evidentiary grounds in support of its conclusions.

In testimony given during the PUC's investigation, a witness for the Telephone Company conceded that the Directory Company's Yellow Pages business was a legacy of the regulated operating company's long dominance of the regional telephone business. The witness also acknowledged that, at the time of the 1984 divestiture, the Directory Company inherited an established directory advertising business from the regulated operating company without having employed its own initiative, skill, investment, or risk-taking in a competitive market. As discussed above, the 1984 DPA that followed granted the Directory Company an exclusive right to promote its association with the Telephone Company for directory advertising and publishing purposes in exchange for a publishing fee.

The PUC also cited evidence showing that prior to the 1991 DLA, the Directory Company began billing its Yellow and White Pages as the "Official Directory" of the Telephone Company. The 1991 DLA expressly granted the Directory Company an exclusive license to use the Telephone Company's name in soliciting directory advertising and to use its name, slogans, and marks in the publishing and distributing of its directories. Advertisements in the Directory Company's 1990-1991 and 1995 directories state that the Directory Company and Telephone Company

belong to the same corporate family and are linked to the reputation of the Telephone Company's predecessor entities, including 100-year-old traditions of quality and service.

The PUC then found that the Directory Company continued to promote its association with the Telephone Company in advertising the advantages of its 2000-2001 Yellow Pages directory, promoting it as having "been in homes and businesses throughout the region for over 100 years," as being "distributed to virtually every home and business in your market," and as having "an unsurpassed record of 100 years of reliable delivery." The PUC also referenced the directory's 2003-2004 edition, which carries the phrase "YOUR DIRECTORY FOR OVER 100 YEARS!" on its cover, as evidence of continued association between the companies. In testimony before the PUC, the Directory Company conceded that it was the only directory publisher to which those claims could apply.

The PUC noted that there was no evidence in the record that the Verizon name and logo "connote[d] in the popular view in New Hampshire" a Verizon company other than the Telephone Company. Citing the history of cross-promotion detailed above, it concluded that the Verizon name and logo, when affixed to directories published on behalf of the Telephone Company, would be identified by consumers and advertisers as representing the Telephone Company, and that the Telephone Company's reputation continued to benefit the Directory Company's Yellow Pages business.

Having reviewed the PUC's order and the underlying record, we disagree with the Telephone Company's assertion that the PUC's determinations regarding the associative value flowing to the Directory Company were merely conclusory.

*D. Section 222(e) of the Telecommunications Act of 1996*

The Telephone Company next argues that § 222(e) of the Telecommunications Act of 1996 (the Act), requiring that subscriber listings be provided on the same terms and conditions to all directory publishers, precluded it from granting the same "special rights or value" to the Directory Company as it had under the 1984 and 1991 agreements. According to the Telephone Company, after 1996 there no longer existed any basis upon which it could demand publishing fees from the Directory Company. The State argues that § 222(e) pertains only to the distribution of subscriber list information and has no effect whatsoever upon the terms of directory publishing agreements such as the 1991 DLA and the 2000 DPA, nor does it prohibit revenue sharing between a public utility and its affiliate.

When interpreting statutes, we ascribe to statutory words and phrases their usual and common meaning, unless the statute suggests otherwise. *State v. Hofland*, 151 N.H. 322, 324 (2004); *see Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 739 (1989); *New Hampshire Hemp Council, Inc. v. Marshall*, 203 F.3d 1, 6 (1st Cir. 2000). When the language of a statute is clear on its face, its meaning is not subject to modification. *Hofland*, 151 N.H. at 324. We will neither consider what the legislature might have said nor add words that it did not see fit to include. *Id; see Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980); *State of R.I. v. Narragansett Indian Tribe*, 19 F.3d 685, 698 (1st Cir. 1994).

Section 222(e) of the Act states:

> [A] telecommunications carrier that provides telephone exchange service shall provide subscriber list information gathered in its capacity as a provider of such service on a timely and unbundled basis, under nondiscriminatory and reasonable rates, terms, and conditions, to any person upon request for the purpose of publishing directories in any format.

47 U.S.C.A. § 222(e). The corollary FCC regulations state that a telecommunications carrier must provide subscriber list information to any directory publisher that requests it at the same rates, terms, and conditions that the carrier provides the information to its directory publishing affiliate. 47 C.F.R. § 64.2321 (2004).

▮ We agree with the State that § 222(e) pertains only to the provision of subscriber list information under nondiscriminatory and reasonable rates, terms, and conditions to any directory publisher that requests it. Section 222(e) speaks only to the exchange of information between a telecommunications provider and directory publishers. Nothing in the language of the statute prohibits a telecommunications provider from transferring the value of its reputation in a regional market to an affiliate directory publisher in exchange for some form of remuneration. Thus, we find nothing in the plain language of § 222(e) that would preclude revenue sharing between the Telephone Company and the Directory Company as part of a publishing arrangement such as the 2000 DPA.

*E. Associative Value*

The Telephone Company also argues that, after the passage of the Act in 1996, it no longer had anything of value to give the Directory Company and therefore "had no basis to require the Directory Company to pay it anything additional to publish its directories." We disagree. Documentary

evidence examined by the PUC showed that the Telephone Company had already adopted the sort of non-discriminatory policy later required by § 222(e) at the time of the 1984 divestiture. A review of the terms of the 1984 DPA and the 1991 DLA confirm that the primary consideration received by the Directory Company was the exclusive right to associate itself with the Telephone Company, not the exclusive access to its database of subscribers.

By the terms of the 2000 DPA, the Directory Company agreed to fulfill the Telephone Company's regulatory obligations with respect to the publication and distribution of telephone directories, including the publication of subscriber listings, publication of "light faced listings" (business subscriber listings published in the Yellow Pages at no charge), and the delivery of directories to subscribers. The 2000 DPA also grants the Directory Company the right to "sell advertising in any section of the Telephone Directories." The 2000-2001 and 2003-2004 "Verizon" directories distributed pursuant to this agreement consisted of White Pages published on behalf of the Telephone Company and the Directory Company's Yellow Pages, bundled together under the same name and logo. We agree with the PUC that the 2000 DPA created an exclusive publishing and advertising arrangement between the Telephone Company and the Directory Company.

█ We, therefore, concur with the PUC that the Telephone Company continued to provide the Directory Company with a compensable associative value after the passage of the Act, and that the PUC was not unjust or unreasonable in finding that the Telephone Company accepted inadequate and insufficient compensation terms under the 2000 DPA.

*F. Transfer of Assets*

The Telephone Company further challenges the PUC's finding that the 1984 DPA was not a sale or other permanent disposition of the Yellow Pages business for regulatory purposes. During the PUC's investigation, however, a Telephone Company witness conceded that the 1984 DPA was not in the form of a purchase or sale of a business or business assets, but rather in the form of an "affiliated agreement." A different Telephone Company witness acknowledged that the agreement did not provide for a sale or permanent transfer of the Telephone Company's right to Yellow Pages revenues.

A review of the terms of the 1984 DPA confirms that it did not effect a permanent sale of assets. The Telephone Company granted the Directory Company the exclusive right to contact subscribers for the purposes of soliciting and obtaining directory advertising to appear in directories

published pursuant to the agreement and expressly limited that right to the period during which the 1984 DPA was in effect. Upon termination of the 1984 DPA, the Directory Company was required to turn over to the Telephone Company "all work in progress, including but not limited to advertising contracts, copy, artwork, and canvassing lists." The PUC was not unreasonable in concluding that the terms of the 1984 DPA were not consistent with a permanent disposition of the Yellow Pages business.

Moreover, the Telephone Company presented the 1984 DPA to the PUC as an affiliate services agreement by filing it pursuant to RSA 366:3. *See* RSA 366:3. The terms of the 1984 DPA are consistent with an agreement for the provision of certain services. At no time in 1984 or the years following did the Telephone Company request PUC approval of the transfer of the Yellow Pages business in the public interest pursuant to RSA 374:30 (1995), which allows a public utility to transfer its "franchise, works, or system," or any part thereof, if the PUC approves of such a transfer after determining that it will be "for the public good." *See* RSA 374:30; *see also Appeal of Public Serv. Co. of N.H.*, 124 N.H. 479, 483 (1984) (recognizing the "fact" that under RSA 374:30, all sales or transfers of regulated public utility property must be approved by the PUC after a finding that the sales are for the public good); *Appeal of Legislative Utility Consumers' Council*, 120 N.H. 173, 174 (1980). At the time of its investigation into the 2000 DPA, the PUC had yet to receive any conclusive evidence or notification from the Telephone Company of a sale or permanent transfer of directory publishing assets.

Prior to 1984, Yellow Pages operations and revenues belonged entirely to the Telephone Company's regulated predecessor operating company, and they earned the company "supra-competitive" profits. *See American Tel. and Tel. Co.*, 552 F. Supp. at 193. All revenues, expenses and assets associated with directory publishing operations were included in the regulated books of the operating company. Thus, the directory publishing assets and operations can fairly be characterized as part of the Telephone Company's "franchise, works, or system."

Among courts addressing analogous issues and circumstances in the wake of the 1984 divestiture, the Supreme Court of Utah reached an instructively similar conclusion. *See U.S. West v. Public Service Com'n of Utah*, 998 P.2d 247 (Utah 2000). Prior to the 1984 divestiture, AT&T's Utah operating company included directory publishing expenses with its other utility operating expenses and applied ratepayer funds without distinction to support both telecommunications services and directory publishing operations. *Id.* at 251. Moreover, directory publishing assets were part of the Utah operating company's rate base. *Id.* Thus, the court found no error in the Utah Public Service Commission's conclusion that

directory publishing operations transferred from the post-divestiture telephone company to its directory publishing affiliate were "utility operations." *Id.*

Even if we were to assume that the Telephone Company attempted or intended to permanently transfer its directory publishing assets and operations to the Directory Company, such transfer would be invalid under RSA 374:30. We conclude, therefore, that the PUC was not unjust or unreasonable in finding that the 1984 DPA was neither in form nor in effect a sale or permanent disposition of the directory publishing business.

Given the deference we accord the PUC in matters such as the one now before us, we affirm its determination that the 2000 DPA was unjust and unreasonable as it pertains to the Telephone Company and its customers.

*II. Imputation of Revenues*

Having determined that the PUC acted in a lawful, just and reasonable manner when it determined that the 2000 DPA was unjust and unreasonable, we now turn to the issue of revenue imputation as a remedy. As we noted at the outset of our analysis, we accord the PUC's policy choices considerable deference, including agency orders which seek to balance competing economic interests. *See Appeal of Campaign for Ratepayers Rights*, 145 N.H. at 675.

The Telephone Company contends that the PUC failed to identify any articulated legal or factual standard when it imputed revenues earned by the unregulated Directory Company to the regulated Telephone Company, and that it misinterpreted the intent of RSA chapter 366 in doing so. Specifically, the Telephone Company asserts that RSA chapter 366 cannot be construed to authorize the PUC to impute revenues to a regulated utility from an unregulated affiliate, because it contemplates only the disallowance of payments between such entities.

This court is the final arbiter of the intent of the legislature as expressed in the words of a statute considered as a whole. *DeLucca v. DeLucca*, 152 N.H. 100, 103 (2005). In interpreting a statute, we first look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning. *Id.* Unless we find that the statutory language is ambiguous, we need not look to legislative intent. *Id.* Furthermore, we interpret statutes in the context of the overall statutory scheme and not in isolation. *Id.*

RSA 366:5, which vests in the PUC the full power and authority to investigate affiliate contracts and agreements filed pursuant to RSA 366:3, states, in relevant part:

> [I]f the [PUC] after notice and hearing shall find any such contract, arrangement, purchase, or sale to be unjust or unreasonable, the [PUC] may make such reasonable order relating thereto as the public good requires. . . . If the public utility and affiliate fail to satisfy the [PUC] of the reasonableness of any such contract, agreement, purchase, or sale, the [PUC] may disapprove the same and disallow payments thereunder or such part of any such payment as the commission shall find to be unjust or unreasonable.

The Telephone Company also points to RSA 366:4 and RSA 366:7, which similarly reference the PUC's authority to disallow payments between a public utility and its affiliate, as evidence that RSA chapter 366 contemplates only the disallowance of payments by the PUC.

If we were to concur with the Telephone Company's reading of RSA 366:5, we would, in effect, hold that the PUC's only remedy upon finding that a contract, agreement, purchase, or sale between a public utility and its affiliate is unjust or unreasonable is to disallow payments called for by the arrangement. The PUC would be left powerless to fashion a remedy in instances such as the one now before us, in which it determines that a contract or agreement is unjust and unreasonable because of the *absence* of payment or compensation. Nothing in the plain language of RSA 366:5 suggests that the legislature intended to so limit the remedial authority of the PUC.

█ The PUC was established to provide comprehensive provisions for the establishment and control of public utilities in the State. *Appeal of Public Serv. Co. of N.H.*, 141 N.H. 13, 22 (1996). As such, we recognize that the PUC has broad statutory powers, *Appeal of Easton*, 125 N.H. 205, 210 (1984), including its broad authority, upon finding that an affiliate contract or agreement is unjust or unreasonable, to "make such reasonable order relating thereto as the public good requires." RSA 366:5. That the legislature permitted additional specific remedies under the statute does not obviate its grant of broad remedial power. We, therefore, disagree with the Telephone Company's contention that the PUC is limited to the disallowance of payments as a remedy under RSA 366:5.

RSA chapter 366 does not specifically prescribe the imputation of revenues as a remedy. We note, however, that the PUC is legislatively empowered to be the arbiter between the interests of the customer and the interests of the regulated utilities. *See* RSA 363:17-a (1995); *see also Appeal of Pinetree Power*, 152 N.H. at 100. The PUC must not only perform duties statutorily created, but also exercise those powers inherent within its broad grant of power. *Appeal of Granite State Elec. Co.*, 120

N.H. 536, 539 (1980). RSA 366:5 grants the PUC the power to make any reasonable order required for the public good when it determines that an affiliate contract or agreement is unjust or unreasonable. *See* RSA 366:5.

Upon concluding that the 2000 DPA was unjust and unreasonable, the PUC determined that imputation was a narrowly tailored remedy that avoided potential disruptions to the Telephone Company and the policies of other States from the potential extra-territorial effect of an order disapproving the 2000 DPA in its entirety. Moreover, the PUC selected imputation as a reasonable means of making the Telephone Company's ratepayers whole, and found that it was consistent with the public good.

The imputation to telephone companies of Yellow Pages revenues earned by directory publishing affiliates is recognized by other jurisdictions. In its order, the PUC specifically considered *U.S. West* because of factual and substantive regulatory similarities to the circumstances attendant to the 2000 DPA. *U.S. West*, 998 P.2d at 247. In *U.S. West*, the Supreme Court of Utah affirmed an order of the Utah Public Service Commission denying a telecommunications services provider's request that it discontinue its practice of imputing profits earned by the carrier's directory publishing affiliate. *Id.* at 253. The factual underpinnings of the case are similar to those of the case now before us. Prior to the 1984 divestiture, AT&T's Utah operating company provided telephone directories to subscribers in conjunction with its telecommunications services, and did so without competition for many decades as a result of AT&T's monopoly position. *Id.* at 250-51. The Utah operating company included its directory publishing expenses with its other utility operation expenses. *Id.* at 251. Following divestiture, the Utah operating company transferred its directory publishing operations to an affiliate company. *Id.*

The Supreme Court of Utah concluded that, in light of the historical relationship between the telecommunications and directory publishing services, the directory operations transferred to the affiliate company were utility operations in which ratepayers had a compensable interest. *Id.* at 250-51. The court proceeded to uphold the Utah Public Service Commission's "regulatory remedy" of imputation. *Id.* at 252-53; *accord U.S. West Communications, Inc. v. Utilities & Transp. Com'n*, 949 P.2d 1337, 1351-52 (Wash. 1997); *Matter of Minn. Public Utilities Com'n*, 417 N.W.2d 274, 285-86 (Minn. Ct. App. 1987); *see also Matter of Rates and Charges of U.S. West*, 909 P.2d 716, 721-22 (N.M. 1995); *cf. Rochester Tel. Corp. v. Public Serv. Com'n*, 660 N.E.2d 1112, 1117 (N.Y. 1995) (imputation of royalty properly compensated ratepayers for telephone corporation's improper cost-shifting and uncompensated transfer of its intangible assets to an unregulated affiliate).

██ Because we conclude that the PUC acted within its broad authority under RSA 366:5 in ordering the imputation of revenues to remedy the defects found in the 2000 DPA, we need not address the question of whether the PUC also had such authority pursuant to RSA 378:7 (1995). Also, we decline to address the Telephone Company's argument that the PUC order will result in a taking of its property without compensation because the Telephone Company has not developed the argument sufficiently to warrant appellate review. *See State v. Fernandez*, 152 N.H. 233, 239 (2005); *see also State v. Chick*, 141 N.H. 503, 504 (1996) (passing reference to a constitutional principle is not a substitute for a valid constitutional argument and is therefore waived).

*III. The $1,000 Civil Penalty*

Finally, we address the Telephone Company's assertion that the PUC unsustainably exercised its discretion by imposing a $1,000 civil penalty for its failure to file the 1999 amendment in the manner required by RSA 366:3. It argues that its failure to file the 1999 amendment with the PUC was inadvertent, and that its subsequently filed financial reports reflected a consequent change in revenues of which the PUC should have been aware.

██ RSA 365:41 (1995) permits the PUC to assess a civil penalty of up to $25,000 against any public utility that violates any provision of Title 34 of the New Hampshire Revised Statutes Annotated, including RSA 366:3. The Telephone Company violated RSA 366:3 by failing to file the 1999 amendment with the PUC. Even assuming that the Telephone Company's failure to file was inadvertent and that it constructively put the PUC on notice of the 1999 amendment in subsequent financial filings, the PUC was still authorized by statute to assess a civil penalty against the Telephone Company, and did so in a reasonable amount. We, therefore, affirm the imposition of the $1,000 civil penalty against the Telephone Company.

*Affirmed.*

BRODERICK, C.J., and NADEAU, DUGGAN and GALWAY, JJ., concurred.